420 F.2d 787
 Howard JAMISON, Administrator of the Estate of William J. Lawless, Deceased.
ELLWOOD CONSOLIDATED WATER COMPANY, a Pennsylvania Corporation, Defendant and Third-Party Plaintiff-Appellant,
v.
J. Thomas JOHNSON, Jr., Individually, and Trading as Bease-Johnson Company, Third-Party Defendant.
 No. 17966.
 United States Court of Appeals Third Circuit.
 Argued November 4, 1969.
 Decided February 2, 1970.
 
 James F. Manley, Burns, Manley & Little, Pittsburgh, Pa., for defendant and third party plaintiff-appellant.
 Donald W. Bebenek, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa. (Kenneth S. Robb, Pittsburgh, Pa., on the brief), for third-party defendant.
 Before MARIS, SEITZ and STAHL, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 This is an appeal from the denial by the district court of a claim for indemnity by third-party plaintiff Ellwood Consolidated Water Company (Water Company) against third-party defendant Bease-Johnson Company (Bease-Johnson) in a Pennsylvania Wrongful Death and Survival action.
 
 
 2
 Bease-Johnson entered into a contract with the Water Company to paint its 60-foot water tower. The plaintiff's decedent William J. Lawless, an employee of Bease-Johnson, was killed while working on the tower. His death was caused by a fall from the upper part of a ladder constructed on the outside of the water tank.
 
 
 3
 After trial to a jury, decedent's administrator was awarded $55,000. In answer to special interrogatories, the jury determined that negligence of the Water Company was a proximate cause of the accident. Its negligence consisted of its failure to comply with certain Pennsylvania Department of Labor and Industry regulations requiring that "Ladders over thirty feet in length shall be provided with cages or wells of adequate dimensions * * *."
 
 
 4
 Water Company, relying on the indemnity provision in the contract, seeks judgment on its third-party complaint against Bease-Johnson in the total amount of the $55,000 verdict. Bease-Johnson denies any liability as indemnitor of Water Company. Both parties agreed at trial that the merits of the indemnity claim turns on the validity and applicability of the following contractual provisions:
 
 
 5
 "CONTRACTOR shall indemnify WATER COMPANY and carry insurance in accordance with the following provisions:
 
 
 6
 * * * * * *
 
 
 7
 "CONTRACTOR agrees to indemnify, hold harmless and defend the WATER COMPANY from and against any and all liability for loss, damage or expense which WATER COMPANY may suffer or for which the WATER COMPANY may be held liable by reason of injury (including death) to any person or damage to any property arising out of or in any manner connected with the operations to be performed under this contract whether or not due in whole or in part to any act, omission, or negligence of the WATER COMPANY or any of its representatives or employees."
 
 
 8
 The contract further provided that Bease-Johnson was not to commence any work under the contract until it had satisfied Water Company that it carried stated amounts of the following insurance: workmen's compensation, unemployment, comprehensive general liability and property damage, and comprehensive automobile liability and property damage.
 
 
 9
 The district court held that the indemnity provision "is contrary to public policy and of no avail for the purpose of insulating [Water Company] from the consequences of its failure to comply with an express statutory enactment designed for the protection of human life."
 
 
 10
 Water Company argues that we are required to hold the instant indemnity provision valid because of the Pennsylvania Supreme Court's decision in Westinghouse Electric Co. v. Murphy, 425 Pa. 166, 228 A.2d 656 (1967). The facts here are similar to those in Westinghouse. Murphy, Inc., a painting and glazing business, contracted with Westinghouse to do certain maintenance work at one of Westinghouse's plants. Because of Westinghouse's negligence, an employee of Murphy was injured while engaged in the contract work at the plant. The contract contained a term providing that Murphy would indemnify Westinghouse against all claims by Murphy's employees, whether or not caused by the negligence of Westinghouse. The court held this indemnity provision applicable and valid. It stated that "where clearly intended by the parties, such contracts [indemnifying one against his own negligence] have been enforced by this Court * * *. It would appear that such contracts are useful to parties involved in construction and similar activities as a means of allocating the responsibility of obtaining insurance * * *."
 
 
 11
 Bease-Johnson would distinguish Westinghouse on the ground that we are here dealing with a failure to comply with a statute designed to protect human life and thus the indemnity clause violates public policy.[1] In essence, it asks us to hold that Pennsylvania would apply the doctrine of Boyd v. Smith, 372 Pa. 306, 94 A.2d 44 (1953), involving an exculpatory clause, to cases involving indemnity clauses as well. In Boyd, the court held that an exculpatory clause in a lease did not insulate a landlord from liability caused by his failure to comply with a statute requiring fire escapes in certain dwellings. The court stated that, although exculpatory clauses are valid generally, "when the legislation in question is, as here, a police measure obviously intended for the protection of human life * * * public policy does not permit an individual to waive the protection which the statute is designed to afford him."
 
 
 12
 Boyd dealt with exculpatory clauses but we are concerned with an indemnity agreement here. The difference between the two is manifest and significant. A valid exculpatory clause precludes recovery by the victim of the negligence. In contrast, a valid indemnity provision in no way affects the victim's right of recovery. Rather, it merely determines who among the parties to the contract shall bear the ultimate cost of the victim's claim. In this case were we to give effect to the indemnification provision, no waiver of the protection of the Department of Labor regulation would result. Indeed, it was the violation of the regulation which formed the basis of a substantial verdict and recovery against Water Company. We are satisfied that here, as in Westinghouse, the intended function of the indemnity provision was to allocate the burden of procuring insurance. This provision, in effect, requires Bease-Johnson to procure insurance to pay any claims arising out of the performance of the contract. Such a provision no more violates public policy than would an insurance policy taken out by Water Company to cover such claims. Indeed, the business reality probably was that the cost of this insurance was borne by Water Company when it paid the painting contract price. Thus, we do not think that Pennsylvania would extend the Boyd doctrine to limit the holding of the Westinghouse case.
 
 
 13
 Notwithstanding this analysis, Bease-Johnson asserts that we are compelled to follow the Boyd rationale. In support of this contention it argues that exculpatory clauses and indemnity clauses are treated the same under the law of Pennsylvania, citing Dilks v. Flohr Chevrolet, Inc., 411 Pa. 425, 192 A.2d 682 (1963). But in our view the Dilks case does not stand for so broad a proposition. The court there applied the general Pennsylvania rule that contracts limiting liability for negligence are not favored and are strictly construed against the party seeking their protection. Specifically, the court held that an exculpatory clause in a lease would not be construed to relieve a landlord from liability for his own negligence since such a limitation was not spelled out in unequivocal terms. In the course of its opinion, the court referred to a prior case which had construed an indemnity clause in a similar way and in a footnote stated that "there is such a substantial kinship between both types of contracts as to render decisions dealing with indemnity clauses applicable to decisions dealing with exculpatory clauses, and vice versa." The Dilks opinion shows an awareness that indemnity and exculpatory clauses are sufficiently similar that the same rules of construction may often be used. However, Dilks clearly did not go so far as to say that the public policy considerations determinative of the legality of exculpatory clauses are necessarily determinative of the legality of indemnity clauses. We think that Pennsylvania would not apply the broad Dilks dictum to invalidate the indemnity clause here — particularly in light of the tolerant view of this type of indemnification Provision expressed in the later Westinghouse case.
 
 
 14
 Bease-Johnson further argues that the indemnity provision, even if valid, should not be construed to apply to these facts since Water Company's failure to install proper safety devices on the ladder is "a situation pre-existing the contract." It asserts that if the parties had desired the indemnification provision to cover "past" negligence, they should have specifically expressed that intent. On this point, Bease-Johnson relies primarily on Employers Liability Assurance Corp. v. Greenville Business Men's Ass'n, 423 Pa. 288, 224 A.2d 620 (1966).[2] Employers held that an ambiguous exculpatory provision will not be construed to apply to subsequent damage caused by negligent acts committed before a lease was entered. Because of the very strong public policy against exculpatory provisions, the parties were presumed to have intended an immunity for only future negligent acts.
 
 
 15
 In our case we are dealing with an indemnity provision, and for the reasons already stated, we do not think that the Dilks dictum makes the Employers case applicable here. We are not convinced that the presumption used in Employers would be extended by the Pennsylvania courts to an indemnity provision such as we have before us. In any case, it is apparent that here the parties did intend indemnification for future injury caused by past negligent acts. The contract states that "It is understood that [Bease-Johnson] is familiar with all factors affecting the work."[3] Moreover, the contract specifically provides that Bease-Johnson could not commence any work until Water Company was shown that it carried sufficient comprehensive general liability and property damage insurance, comprehensive automobile liability and property damage insurance, unemployment insurance, and workmen's compensation insurance. Thus it is clear that the parties intended to allocate the burden of obtaining insurance to cover liability for all accidents that might occur in the performance of the contract. It would be straining belief to conclude that they intended a risk coverage so restricted as that now suggested by Bease-Johnson.
 
 
 16
 Looking to all the circumstances surrounding this provision, and recognizing that this is an indemnity and not an exculpatory provision, we conclude that Pennsylvania would hold that the parties intended Bease-Johnson to indemnify Water Company for the damages arising out of this accident even though the negligent condition existed prior to the execution of the indemnity provision.
 
 
 17
 The judgment of the district court will be reversed and the case remanded for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Apparently, it assumes that in Westinghouse there was no violation of public policy. The report of the case does not reveal what the negligence was
 
 
 [2]
 See also Kotwasinski v. Rasner, 436 Pa. 32, 258 A.2d 865 (1969)
 
 
 [3]
 In contrast, the tenants in bothEmployers and Kotwasinski had no knowledge or reason to know of the defective conditions which subsequently caused the damage.
 
 
 
 18
 STAHL, Circuit Judge (dissenting).
 
 
 19
 This troublesome case presents the difficult question of whether a contractual provision, otherwise controlling between the parties, is unenforceable, because it is contrary to public policy. The district court so held and I believe we should affirm. Accordingly, I respectfully dissent.
 
 
 20
 By the Act of May 18, 1937, P.L. 654, as amended, 43 P.S. 25-1 et seq., the Pennsylvania legislature required that all places or "establishments" within the state where persons work must meet certain minimum standards of safety. The intention of the act clearly was to protect workingmen by requiring safe working conditions.
 
 
 21
 The legislature granted the State Department of Labor and Industry the power to promulgate and enforce regulations pertaining to equipment used at places of work. The Department adopted mandatory safety regulations pertaining to ladders. It is undisputed that Ellwood's negligent failure to comply with these regulations was a proximate cause of the death in this case.
 
 
 22
 Normally Ellwood did not have occasion to make use of ladders in its operation although it had constructed a ladder on the outside of its water tower. When Ellwood contracted with Bease-Johnson to have the tower painted, it required the contractor to agree to indemnify it for losses arising in the course of the job, even if occasioned by Ellwood's own negligence, and further required the contractor to procure insurance to cover any losses.
 
 
 23
 Though Pennsylvania has enforced agreements for the indemnification of the negligence of the indemnitee, there does not appear to be any case dealing with such an agreement where there is involved a statutory public policy for the protection of the public safety. In the Westinghouse case on which the majority relies, the indemnitor raised only the question of whether the agreement there could properly be construed to reach a situation where the loss was caused by the negligence of the indemnitee.
 
 
 24
 As the majority acknowledges, under Pennsylvania law an agreement exculpating a party from financial responsibility for a loss caused to the other party to a contract is unenforceable where it conflicts with a statutory public policy. The majority concludes, however, that this principle does not apply to the indemnity agreement here despite the "substantial kinship" between these types of provisions expressly recognized by the Pennsylvania Supreme Court in Dilks v. Flohr Chevrolet, Inc., 411 Pa. 425, 192 A.2d 682, 687 n. 11 (1963):
 
 
 25
 While an exculpatory clause — which deprives one contracting party of a right to recover for damages suffered through the negligence of the other contracting party — differs somewhat from an indemnity clause — which effects a change in the person who ultimately has to pay the damages — yet there is such a substantial kinship between both types of contracts as to render decisions dealing with indemnity clauses applicable to decisions dealing with exculpatory clauses, and vice versa.
 
 
 26
 The majority's reasoning is that unlike an exculpatory clause the indemnity provision here does not affect the victim's right to recover. Thus they hold that enforcement of the agreement works "no waiver of the protection of the Department of Labor regulation."
 
 
 27
 I disagree with this conclusion. The purpose of the legislative scheme to protect the public safety was not merely to make it easier for workmen to recover damages. The purpose was to compel compliance with the safety requirements in the first instance. The different effects of exculpatory and indemnification provisions upon the right of an injured party to recover do not go to the key issue which concerns us here: Does the indemnity agreement conflict with public policy?
 
 
 28
 The leading case expounding the Pennsylvania law in this area is Boyd v. Smith, 327 Pa. 306, 94 A.2d 44 (1953). In that case a tenant sued for injuries suffered as a result of his landlord's failure to comply with the state statute requiring that apartment houses be equipped with adequate fire escapes. As in this case, the landlord's failure to comply with the requirement constituted negligence per se. A provision of the lease exculpating the landlord from responsibility for injuries caused by his negligence was raised as a defense.
 
 
 29
 The state court held that although such clauses are ordinarily valid, they are not enforceable when in contravention of a strong public policy. The court found such a policy in Boyd because the landlord's failure to fulfill his duty to provide proper fire escapes was "a matter of interest to the public." The statutory requirement had been imposed "for the protection of human life." The landlord's duty to observe such a statute, the court said, "cannot be waived by an individual or denied effect by courts, since the integrity of the rule expressed by the Legislature is necessary for the common welfare." 94 A.2d at 46.[1]
 
 
 30
 The import of Boyd was that to permit the landlord to avoid responsibility for non-compliance would be to defeat the statutory purpose of protecting the public against the possibility of injury. If the landlord could contract away his responsibility, the likelihood that he would provide the required fire escapes was lessened.
 
 
 31
 I believe that a careful reading of Boyd makes clear that it was not solely the fact that the tenant's injury would remain uncompensated that led the court to outlaw the exculpatory clause. The crux of the public interest was the requirement of safe fire escapes, and public policy was directly contravened because the agreement tended to deprive the tenant, as well as the public, of the protection sought to be assured by the state.
 
 
 32
 Similarly, to look only to the availability of recovery in the present case seems to me inappropriate. The statute regulating working conditions for establishments was not designed to guarantee the availability of damages for injured workmen and their families after the fact. Like the legislation in Boyd, it was intended to prevent the occurrence of accidents and to protect human life. If the indemnity agreement here tends to weaken the statutory protection, it is in contravention of public policy, like Boyd, and should not be enforced.
 
 
 33
 From the facts here, I am convinced that enforcement of the indemnity agreement would weaken the protection of the state's safety requirements. Ellwood does not use the ladder on its water tank in the ordinary course of business. There is therefore no incentive to install the required safety devices for those occasions on which work is to be done on the tank if the owner can contract away its responsibility for failing to comply with the state standards. On the other hand, a contractor in the position of Bease-Johnson, while accepting financial responsibility for a violation, would be unlikely to furnish the mandated safety equipment since the cost would be high and insurance is available. Consequently, the required equipment may not be supplied, and workers will be compelled to risk unsafe conditions.
 
 
 34
 In my view the only way to make certain the fulfillment of the legislative mandate of public safety is to refuse to allow Ellwood to contract away the responsibility placed on owners of "establishments" by the state legislature. The availability of insurance to Ellwood to cover its own liability would not change the result. This would in fact engender pressure from the insurer to comply with the state requirements.
 
 
 35
 As indicated above, the Pennsylvania Supreme Court in Dilks, supra, has pointed the way to similar treatment of exculpatory clauses and indemnity agreements. The majority chooses to disregard this authority because the state court "did not go so far as to say that the public policy considerations determinative of the legality of exculpatory clauses are necessarily determinative of the legality of indemnity clauses." This is, of course, literally correct. On close examination, however, the policy considerations underlying Boyd are equally relevant here,[2] and I think it is appropriate to give the Dilks statement the more expansive significance to which its words lead. I therefore agree with Judge Sorg below that the indemnity agreement "is contrary to public policy and of no avail for the purpose of insulating Ellwood Water from the consequences of its failure to comply with an express statutory enactment designed for the protection of human life."
 
 
 
 Notes:
 
 
 [1]
 The court also said:
 Where the legislature has, by definite and unequivocal language, determined the public policy of this Commonwealth with regard to a particular subject, that pronouncement cannot be set aside and rendered unenforceable by a contract between individuals. * * * The clause in the lease here invoked * * * is violative of that policy and is therefore legally inoperative and void. 94 A.2d at 46.
 
 
 [2]
 See Gilpin v. Abraham, 218 F.Supp. 414 (E.D.Pa.1963), where theBoyd doctrine was followed in a situation where a landlord sought indemnification from his tenant for a loss occasioned by an injury to a guest.