Westinghouse Electric Company *v.* Murphy, Inc., Appellant.

Argued December 2, 1966. Before BELL, C. J., MUS-MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

T. E. Byrne, Jr., with him Robert K. Wood, and Krusen, Evans and Byrne, for appellant.

John B. H. Carter, Aaron D. Blumberg, Edward W. Madeira, Jr., and Pepper, Hamilton & Scheetz, for appellee.

OPINION BY MR. JUSTICE ROBERTS, April 18, 1967:

James Rhodes was an employee of Murphy, Inc., a concern engaged in the painting and glazing business. On December 14, 1962, Rhodes was injured while engaged in work which Murphy had agreed to perform for Westinghouse Electric at the Westinghouse plant in Lester, Pennsylvania. Rhodes sued Westinghouse for the injury and Westinghouse joined Murphy as an additional defendant. The action by Rhodes was settled for $67,500, half of which was paid by Murphy's insurer and half by Westinghouse's insurer. At the time of settlement, it was agreed by Westinghouse and Murphy, that the dispute between them as to the liability for Rhodes' claim should be determined in subsequent litigation between them.

Thereafter, Westinghouse filed an action of assumpsit for $33,750 against Murphy alleging that the terms of the contract between them required Murphy to indemnify Westinghouse for the amount paid by it in settlement of Rhodes' injury despite the fact that the injury was due to the negligence of Westinghouse. Murphy's answer denied this contractual obligation and counterclaimed for the $33,750 paid by its insurer in settlement of Rhodes' claim. A jury trial was waived, no testimony taken and the case submitted to the court below on a stipulation. This is an appeal from the

judgment of the court below granting the prayer of Westinghouse's complaint and denying that of Murphy's counterclaim.

Stated simply the legal question before us is whether the contract under which Murphy was performing work for Westinghouse included an enforcible term providing that Murphy would indemnify Westinghouse for liability arising out of the job created by Westinghouse's negligence. In order to answer this question it is necessary to describe in some detail the history of business relations between Murphy and Westinghouse prior to the date of Rhodes' accident.

Westinghouse is the owner of a large facility located at Lester, Pennsylvania which requires continuing maintenance. On some eighty occasions between November 1956 and November 1962 Westinghouse had contracted with Murphy to perform aspects of this work. In connection with each of these eighty jobs, Westinghouse issued to Murphy a purchase order form. On the face of the purchase order form under the heading "INSTRUCTION TO SUPPLIER" are seven items each in fine print. Item number seven is as follows: "TERMS. Subject to terms and conditions printed on the back, and to specifications, drawings and additional terms and conditions referred to herein and/or attached hereto." The reverse side of the purchase order is almost completely taken up by fifteen finely printed "terms and conditions". The fifteenth item is as follows: "When Seller during the performance under this order will send its employes onto Buyer's premises, the provisions of Appendix D, Westinghouse Form 29181 shall apply, whether or not Appendix D is attached hereto. (Buyer will furnish copies on request.)"

Appendix D in pertinent part provides:[1] "(b) Seller shall . . . indemnify and save harmless the Buyer

---

[1] The language of Appendix D is not finely printed.

against and from any and all claims, demands, actions, courses of action, suits and all other liabilities whatsoever on account of, or by reason of, or growing out of personal injuries or death to seller or its employees, or property damage suffered by Seller and its employees, *whether the same results from negligence of Buyer or Buyer's employees or otherwise, it being the intent of this provision to absolve and protect Buyer from any and all loss by reason of the premises.* (c) Buyer, at its option, may require Seller to supply evidence of insurance satisfactory to Buyer covering the liabilities and indemnification included in paragraphs (a) and (b) above." (Emphasis supplied.)

On six occasions—the earliest being November 12, 1956 and the latest being November 4, 1960—a copy of Appendix D was physically attached to the purchase order sent by Westinghouse to Murphy. On the twenty-two occasions between November 4, 1960 and November 7, 1962, on which Westinghouse contracted for Murphy's painting and glazing services, the Westinghouse purchase order *had typed on its face* the notation "APPENDIX D & S APPLY YOU HAVE COPIES."

On January 3, 1962, Murphy furnished to Westinghouse a certificate of insurance applicable to the calendar year 1962. Murphy claims that this certificate did not insure it for loss occasioned by Westinghouse's negligence and asserts that the lack of such coverage was evident on the face of the certificate. Murphy further claims that it was never informed by Westinghouse of this deficiency in coverage, but admits in its brief that the deficiency was brought to its attention by another source before the Rhodes' accident so that by that time its insurance included coverage for loss caused by Westinghouse's negligence.

It would appear from the record that on most occasions on which Westinghouse and Murphy did business, a purchase order was issued to Murphy and a

signed "acknowledgement" copy returned by Murphy to Westinghouse before work was actually begun by Murphy on a particular job. Sometimes, however, the need for dispatch was such that Murphy actually began work after oral negotiations and before issuance of the purchase order.

The job on which Rhodes was injured was one of those on which work began before the purchase order was issued. Specifically, the sequence of events which led up to that job was as follows: Late in October 1962, Westinghouse orally invited Murphy to bid on a job. Murphy responded with an oral bid which was, in turn, confirmed by a letter by Murphy to Westinghouse dated October 30, 1962. In that letter Murphy stated "we are fully covered with Workmen's Compensation, Liability and Property Damage Insurance." Oral acceptance of the terms of this letter was made by Westinghouse on October 31, 1962 and work was begun the same day. On November 7, 1962, Westinghouse prepared and sent to Murphy a purchase order (No. 51-466614) on the form described above.[2] The record contains no evidence, however, that the attached acknowledgement was signed and returned by Murphy to Westinghouse. Nonetheless, when Murphy on February 28, 1963—some two and a half months after Rhodes' accident—submitted its invoice to Westinghouse for payment, the invoice bore the heading "Replacing broken glass in accordance with your Order No. 51-466614."

In its brief, Murphy seeks to avoid liability to Westinghouse on the theory that its contract never included

---

[2] Although the face of the purchase order of November 7, 1962 did not contain the *typed* notation "APPENDIX D & S APPLIES YOU HAVE COPIES" which had appeared on the face of the preceding twenty-two purchase orders, that notation was typed prominently on the sheet of specifications attached to the purchase order and was referred to by a notation typed on the face of the purchase order: "SEE ATTACHED SHEET FOR ALL INFORMATION."

Appendix D. Murphy thus takes the position that the specific terms of its obligation had been fixed when Westinghouse on October 31, 1962 orally accepted its written bid of October 30, 1962. At that point, Murphy insists, there is no evidence that the contract contained any reference to or inclusion of Appendix D and therefore, after that, the contract could not have been modified by the inclusion of Appendix D absent new consideration.[3]

We do not agree with Murphy. The fact that there is no evidence of record showing explicit reference to Appendix D in the parties' negotiations up to November 7, 1962 does not preclude us from concluding it to have been included. The existence of a contractual term may be shown by acts of the parties as well as precise words, where to do so would not violate the words used in a contract, see *Yezbak v. Croce,* 370 Pa. 263, 266, 88 A. 2d 80, 81 (1952); 3 Corbin, Contracts §556 (1960). Especially if evidence of the contract is not an integrated document, and, moreover, one partly or wholly composed of oral communications, the precise content of which is not of record, courts must look to surrounding circumstances and the course of dealings between the parties, *Silverstein v. Hornick,* 376

---

[3] Insofar as the common law is concerned, Murphy is, broadly speaking, correct that an agreement modifying a contract requires consideration to be binding. See, e.g., *Wilcox v. Regester,* 417 Pa. 475, 482, 207 A. 2d 817, 821 (1965). The Uniform Commercial Code §2-209(1), Act of April 6, 1953, P. L. 3, §2-209(1), 12A P.S. §2-209(1) is to the contrary as to contracts controlled thereby. Whether the instant contract for work and materials is within Article 2 of the Code is doubtful. See *Epstein v. Giannattasio,* 25 Conn. Supp. 109, 197 A. 2d 342 (1963); 1 Uniform Laws Annotated, Sales §1 at 58-59, 63 (1950) and at 37, 41-42 (Supp. 1966); compare 2 Corbin, Contracts §476 (1950). However, it is not necessary to our solution of the problems raised in the instant case to determine whether the instant contract is controlled by Article 2 of the Code.

Pa. 536, 103 A. 2d 734 (1954), to ascertain the intention of the parties.[4] Given the frequency of the issuance by Westinghouse of its purchase order forms referring to Appendix D, we think there can be little doubt that Westinghouse intended this particular contract to include Appendix D. If by no other means, Murphy's assent to the inclusion of Appendix D is shown by the statement in its letter of October 30, 1962 that it was "fully covered" with insurance coupled with the fact that it had obtained insurance covering the contingency which actually occurred. Moreover, while nothing in the record shows that Murphy signed and returned the "acknowledgement" copy of the purchase order form—thereby formally assenting to it as the written embodiment of the parties' dealings—the fact that Murphy accepted without objection the purchase order form and, later, headed its demand for payment with the legend "Replacing broken glass in accordance with your Order No. 51-466614" in itself virtually compels the conclusion that Murphy also considered that the purchase order embodied its contract with Westinghouse. *Joseph v. Atlantic Baisin Iron Works, Inc.,* 132 N.Y.S. 2d 671 (S. Ct. 1954), aff'd mem., 285 App. Div. 1147, 143 N.Y.S. 2d 601 (1955).

Even assuming the reference to Appendix D was incorporated into its contract with Westinghouse, Murphy contends it should not be held liable for an injury caused by the negligence of Westinghouse. In support of this contention, Murphy relies on the rule that contracts will not be construed to indemnify a party for his own negligence, unless the contractual language and surrounding circumstances clearly indicate the intention of the parties so to do. *Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc.,* 404 Pa. 53, 171 A.

---

[4] Compare, as to contracts under the Uniform Commercial Code, Act of April 6, 1953, P. L. 3, §1-205, as amended, Act of October 2, 1959, P. L. 1023, §1, 12A P.S. §1-205 (Supp. 1966).

2d 185 (1961); *Perry v. Payne,* 217 Pa. 252, 66 Atl. 553 (1907); but see *Tidewater Field Warehouses, Inc. v. Fred Whitaker Co.,* 370 Pa. 538, 88 A. 2d 796 (1952); Note, Contract Recovery in Pennsylvania By a Negligent Indemnitee, 14 U. Pitt. L. Rev. 419 (1953).[5] In essence, Murphy urges that since Appendix D was not spelled out in large type in the body of each purchase order form, the instant case falls within the rule of those cases. We do not agree.

In the first place, it should be noted that none of the contractual provisions involved in the *Pittsburgh* and *Perry* cases explicitly referred to losses arising from the negligence of the alleged indemnitee, as does the language of Appendix D. Rather the language in those cases merely imposed an obligation to indemnify for "all liability" or "all loss."[6] Thus, in the instant case the words of the contract itself far more clearly put the parties on notice that the indemnitor is liable for loss arising solely from the negligence of the indemnitee than the words used in *Pittsburgh* and *Perry.* Indeed, as far as language itself is concerned, we find it hard to imagine a provision which by greater precision or emphasis, could more clearly advise its reader that Westinghouse intended to indemnify itself against

---

[5] A contract indemnifying one against his own negligence is not necessarily against public policy, even though the indemnitor is not in the insurance business, *Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc.,* 404 Pa. 53, 57, 171 A. 2d 185, 187 (1961) (dictum). Where clearly intended by the parties, such contracts have been enforced by this Court, *Tidewater Field Warehouses, Inc. v. Fred Whitaker Co.,* 370 Pa. 538, 88 A. 2d 796 (1952). It would appear that such contracts are useful to parties involved in construction and similar activities as a means of allocating the responsibility for obtaining insurance, *Spurr v. Acme Steel Co.,* 238 F. Supp. 606 (N.D. Ill. 1964).

[6] See *Darrow v. Keystone Stores, Inc.,* 365 Pa. 123, 74 A. 2d 176 (1950); *Schroeder v. Gulf Refining Co.,* 300 Pa. 405, 150 Atl. 665 (1930).

its own negligence. Secondly, in view of the plainly typed copies of Appendix D received by Murphy on six occasions prior to the contract coupled with the clearly *typed* reference to Appendix D on each of the twenty-three purchase order forms or its attachments immediately preceding and including the form issued in this case, we must reject Murphy's contention that it could not reasonably have been on notice of Appendix D and hence be bound to have intended its inclusion in the contract. The sheer repetition of the appearance of the reference to Appendix D suggests that Murphy was on notice as to the contents of the indemnity provision.

Murphy's final argument against its liability relies on our decisions in *L. B. Foster Co. v. Tri-W Constr. Co.*, 409 Pa. 318, 186 A. 2d 18 (1962) ; *Frantz Tractor Co. v. Wyoming Valley Nursery*, 384 Pa. 213, 120 A. 2d 303 (1956) ; and *Cutler Corp. v. Latshaw*, 374 Pa. 1, 97 A. 2d 234 (1953). In those cases we refused to give effect to warrants of attorney to confess judgment which appeared in fine print, on the reverse side of written agreements,[7] because we believed that the signatures of the obligors appearing on the face of the contracts did not indicate conscious assent to the warrant of attorney. Murphy contends that the same rule should apply to obligations to indemnify a party for its own negligence, because both type of obligations are against the normal expectations of contracting parties.[8]

---

[7] In its brief, Murphy appears to rely to a considerable extent on the obscurity of the references to Appendix D finely printed on the form. This consideration is hardly persuasive in light of the additional fact that reference to Appendix D was typed on the form on each of the twenty-two purchase orders immediately preceding the instant contract.

[8] *Spurr v. Acme Steel Co.*, supra note 5, however, indicates that in construction and related fields parties often agree to indemnify another for his own negligence,

We believe that this argument is not persuasive for two reasons. To begin with, the refusal of a court to enforce the obligation of a warrant of attorney to confess judgment, where the assent of the obligor is not clear, is not nearly as drastic an alteration of the basic substantive rights of contracting parties as a similar refusal to enforce an indemnity agreement of the kind involved in the instant case. Once the warrant has been held not binding, the obligee may still proceed against the obligor on the underlying contractual right, whereas if an indemnity agreement were set aside because of the possibility that the obligor has not consciously assented, the obligee would be deprived of his underlying right—one which, despite the absence of a signature directly related to the indemnity agreement, may have been bargained for in fact. Most importantly in this case, however, we believe that the prior course of dealings between the parties was sufficient to indicate that Murphy knew or should have known of the inclusion of Appendix D in its contract with Westinghouse. Against the factual circumstances present in this case, Murphy's acquiescence in this knowledge prevents us from accepting its contention that it did not thereby consciously assent to having Appendix D apply to its contract with Westinghouse.

Judgment affirmed.