## Care v. Berger

*George W. Gekas*, for plaintiff.
*Edward E. Knauss*, for defendants.

DOWLING, *J.*, June 26, 1975—The great flood of '72 is still with us. A seventh-floor tenant in the Executive House, one of our local skyscrapers, should have been safe from the raging Susquehanna; yet the effect of its inundating waters percolated into this modern structure, attacking its electrical power source so that the office/apartment complex was deprived of light, heat and elevator. Plaintiff, stranded in the lobby, suffered serious injuries in a fall while ascending, in the dark, an emergency stairway in an attempt to reach her apartment.

She sued, alleging various acts of negligence, including directing the tenants to use the emergency stairway which was completely devoid of light, failing to provide some means of illumination, not ordering the building evacuated and neglecting to warn plaintiff of the dangerous condition of the dark stairway. Following responsive pleadings, including the introduction of a contract containing an exculpatory clause and the taking of plaintiff's deposition, a motion for summary judgment was filed by defendant.

The motion alleged three reasons: defendant's freedom from negligence as a matter of law, plaintiff's contributory negligence or assumption of risk, and the barring of any right of action by the hold harmless features of the rental contract. However, defendants, at the time of oral argument and in their briefs, speak only to the last two issues; that is, culpability of plaintiff and the legal effect of the lease.

Thus, once again we are urged to deprive a party of his day in court. We recently had occasion to consider a somewhat similar affair where a lady, faced with two doors, made the wrong decision and

was precipitated, in the dark, down a stairway. In discussing this situation in Eitel v. Stroba, 96 Dauph. 416 (1974), we set forth the general principles of law governing this procedure.

"It is well settled and beyond reasonable dispute that such a severe dispository procedure should not be granted except in the 'clearest' of cases where there is not the least doubt as to the absence of a triable issue of material fact. Mallesky v. Stevens, 427 Pa. 352 (1967); Kotwasinski v. Rasner, 436 Pa. 32 (1969); Toth v. Philadelphia, 213 Pa. Superior Ct. 282 (1968); McFadden v. American Oil Co., 215 Pa. Superior Ct. 44 (1969).

"The burden of proving the absence of any genuine issue of fact is on the moving party and all doubt in reference thereto must be resolved against that moving party. Schacter v. Albert, 212 Pa. Superior Ct. 58 (1968); Prince v. Pavoni, 225 Pa. Superior Ct. 286 (1973). See also our recent Opinion in Morgan v. Continental Casualty Co., 96 Dau. 283 (1974)."

Defendants say that plaintiff, forsaking her name, was so careless that she should not be allowed to plead her cause to a jury of her peers. This indictment grows out of her deposition, wherein she related what occurred on June 23, 1972, at about 3 o'clock p.m. Elsie left the Executive House, descending to the first floor by means of the elevator and went out to view the flood scene. When she returned to the building, she and other persons present were told by the superintendent that the last elevator had been shut off and the only way they could get to their apartments was by the emergency stairway. Ms. Care had known of the existence of the emergency stairs but had never before used them. Defendants' employes unlocked

the entrance door and a group, including the plaintiff, started to ascend. There was no light in the stairwell, nor did the superintendent or any of his workmen provide them with any. The door was kept open but it was quite dark. She said that someone in the group had a cigarette lighter which they kept on lighting. As she ascended, she was afraid she might go beyond her floor so she decided to leave this stairway and continue her ascent in another stairwell at the other end which opened directly in front of her apartment door. She did so and said that, as she traversed the length of the hallway, there was some light coming from underneath the doors. She entered the emergency stairwell at the opposite end and as she did so, the door shut automatically behind her. When this happened, she found herself completely in the dark. She reached for the rail but grabbed the descending one rather than the ascending one, lost her balance and fell, sustaining serious injuries.

While there is an abundance of case law on situations of this nature, we are still somewhat in the dark in appraising this particular case. The decisions keep emphasizing a two-fold classification: those in which a person wanders in a place absolutely dark and where, though not a trespasser, there is no reasonable necessity for his presence; and other cases where there is some fairly compelling reason for walking in the place which, though dark, is not utterly devoid of light. In the former, recovery is denied as a matter of law and in the latter, the issue of contributory negligence is a jury question: Dively v. Penn-Pittsburgh Corporation, 332 Pa. 65 (1938); Slobodzian v. Beighley, 401 Pa. 520 (1960). In short, if it is absolutely dark and there is no reasonable necessity for one's presence,

you have no suit. If it is not utterly devoid of light and there is a fairly compelling reason for your presence, you go to the jury. Fine. But how illuminating is this guideline where the conjunctives fail to match, as in our case? While we can definitely state it was absolutely dark in the stairwell (plaintiff testified to this at various places in her deposition), yet can we be so positive on the question of reasonable necessity for her presence? It was certainly natural that she should want to return to her home, that is, her apartment on the seventh floor, and the only available way of reaching it appeared to be the course pointed out to her by defendants' employes—that is, to use the emergency stairway. No flashlight, candles, etc., were furnished to her and perhaps she should have waited either until they were available, or remained in the lobby. But are these not matters on which reasonable men might differ and, hence, particularly in the province of the jury.

We also note that, even in the absolute dark cases, many involve situations where the person, after becoming aware of the dangerous situation, continued to grope about in an effort to reach his destination. For example, in Hoffner v. Bergdoll, 309 Pa. 558 (1933), it was obvious to the injured plaintiff the moment the door closed behind her that she was in a place so dark that almost nothing could be seen, but, nevertheless, she continued to walk forward to reach an elevator. In Cannon v. Blatt, 342 Pa. 303 (1941), the injured woman continued along the hall after a candle had blown out. Conboy v. Osage Tribe No. 113, 228 Pa. 193 (1927), involved plaintiff descending the stairs in a totally dark area.

In our case, Ms. Care testified that when the door automatically shut behind her and she was in the pitch dark, she immediately reached for the first rail, put her foot out and lost her balance. This is somewhat analogous to the situation in the leading case of Dively v. Penn-Pittsburgh Corporation, supra, where plaintiff was injured on her way to the ladies' room and the court, in holding that her contributory negligence was for the jury, stated (p. 70): "True, had she ventured to walk in the darkness beyond the screen, such conduct might have been negligent, but her fall resulted from the first step she made as she rounded it and not from any attempt to venture across an unlit, unfamiliar area."

When Elsie Care moved to the Executive House, she was required to sign a lease. Defendants now say she also signed away her lawsuit because the document contained an "exculpatory clause." The voluminous contract does indeed contain provisions releasing the landlord from liability under the circumstances alleged in the complaint. When asked if she had read the lease, she replied "I had a copy but I didn't understand anything to read it over. I just assumed it was legal by the law. I don't think anybody ever read a whole lease. Maybe you lawyers do."

In size and print, the lease resembles a Sears Roebuck catalog and for Elsie to have read and digested it would have been a real challenge to her eyesight, patience and comprehension. In the time it would have taken for her to accomplish this Herculean task, she would probably have owed a month's rent or the apartment would have been leased to another.

Modern high-rises should be matched by an up-

to-date elevating of the legal principles applicable to the rights of tenants confronted with legal documents of telephone directory length containing, deep within, provisions giving up some of their fundamental rights.

The law has been moving upward. The sacrosanct character once afforded exculpatory provisions has been denuded[1] but one may speculate as to whether the time has not arrived to completely wash away such one-sided provisions. But be that as it may, we must look to the law as presently proclaimed by our appellate courts.

Employers L.A.C. v. Greenville B. Men's A., 423 Pa. 288, 291 (1966), sets forth the current status:

"Generally speaking, an exculpatory clause is valid if: (a) 'it does not contravene any policy of the law, that is, if it is not a matter of interest to the public or State. . . .' (Dilks v. Flohr Chevrolet, 411 Pa. 425, 434, 192 A. 2d 682 (1963) and authorities therein cited); (b) 'the contract is between persons relating entirely to their own private affairs' (Dilks v. Flohr Chevrolet, supra, page 433); (c) 'each party is a free bargaining agent' and the clause is not in effect 'a mere contract of adhesion, whereby [one party] simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely.'"

The modern approach is spelled out by Justice Cullen in Galligan v. Arovitch, 421 Pa. 301, 304 (1966), wherein he stated:

". . . The exculpatory clause is today contained in

---

1. It is also interesting to note that as far back as Crew v. Bradstreet, 134 Pa. 161 (1885), the Supreme Court stated that contracts against liability for negligence are not favored by the law.

every form lease and, understandably enough, landlords are unwilling to strike therefrom that provision which strongly favors them. Thus it is fruitless for the prospective tenant of an apartment to seek a lease having no exculpatory clause. The result is that the tenant has no bargaining power and must accept his landlord's terms. There is no meeting of the minds, and the agreement is, in effect a mere contract of adhesion, whereby the tenant simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely. It is obvious that analysis of the form lease in terms of traditional contract principles will not suffice, for those rules were developed for negotiated transactions which embody the intention of both parties. Note: The Form 50 Lease: Judicial Treatment of an Adhesion Contract, 111 U. Pa. L. Rev. 1197, 1206 (1963). I do not dispute the rule that a covenant against liability for acts of negligence is valid and enforceable when entered into by private individuals in furtherance of their personal affairs. Cannon v. Bresch, 307 Pa. 31, 160 Atl. 595 (1932). But I do believe that such a rule necessarily assumes that each party is a free bargaining agent, which, it is evident, a prospective tenant for an apartment being unable to bargain away an exculpatory clause, is not."

The several cases cited by defendant, Westinghouse v. Murphy, 425 Pa. 166 (1967), and Warren City Lines, Inc. v. United Refining Co., 220 Pa. Superior Ct. 308 (1971), involve corporate parties and have no realistic relationship to Tenant v. the Executive House. Interesting is the comment in the latter case, Warren City Lines, Inc., supra, where the court notes at page 314: "It is an unescapable fact, however, that the party transferring the risk

has no incentive to use reasonable care when it is held harmless for all losses resulting from its own negligence. . . ."

Accompanying defendant's motion is an affidavit from defendants to the effect that Elsie could have indeed altered the terms of the lease because several other tenants had done so. Thus, a Rosa Goldsmith had been permitted to add to the lease a provision that would terminate it at the end of 60 days following her death. James Kimberling had been permitted to delete a provision prohibiting washing machines, and the Honorable Mark T. Milnor and Mary G. Milnor to, within 60 days of the survivor's death, terminate the lease of the smaller of the two apartments which they rent.

Ms. Care testified that there was never any discussion about changing the terms of her lease and that she was simply asked to sign it. It is also obvious that the changes acceded to in the other leases impose no substantial legal burden as would the waiving of an exculpatory clause.

### ORDER

And now, June 26, 1975, defendants' motion for summary judgment is denied.