542 A.2d 583

Betty J. Burgan, Admrx. of the Estate of Andrew F. Burgan, Deceased *v.* City of Pittsburgh et al. Commonwealth of Pennsylvania, Department of Transportation, Appellant.

The Kroger Company *v.* City of Pittsburgh et al. Commonwealth of Pennsylvania, Department of Transportation, Appellant.

Thomas Apitsch and Patricia Apitsch *v.* Ram Construction Company et al. Commonwealth of Pennsylvania, Department of Transportation, Appellant.

Cramer Reclamation, Inc. *v.* Ram Construction Company et al. Commonwealth of Pennsylvania, Department of Transportation, Appellant.

Betty J. Burgan, Administratrix of the Estate of Andrew F. Burgan, Deceased *v.* City of Pittsburgh et al. Controlled Blasting, Inc., Appellant.

Thomas Apitsch and Patricia Apitsch *v.* Ram Construction Company et al. Controlled Blasting, Inc., Appellant.

The Kroger Company v. City of Pittsburgh et al. Controlled Blasting, Inc., Appellant.

Cramer Reclamation, Inc. *v.* Ram Construction Company et al. Controlled Blasting, Inc., Appellant.

The Kroger Company *v.* City of Pittsburgh et al. Ram Construction Company, Appellant.

Argued October 6, 1987, before President Judge CRUMLISH, JR., Judge COLINS, and Senior Judge BARBIERI, sitting as a panel of three.

*Frank J. Micale,* Deputy Attorney General, with him, *Mark E. Garber,* Chief, Tort Litigation Unit, and *LeRoy S. Zimmerman,* Attorney General, for appellant, Commonwealth of Pennsylvania, Department of Transportation.

*Louis Anstandig, Egler, Anstandig, Garrett & Riley,* for appellant/appellee, Ram Construction Company.

*Robert B. Smith,* Assistant City Solicitor, for appellee, City of Pittsburgh.

*Robert F. McCabe, Lindsay, McGinnis, McCandless & McCabe,* for appellee, A. M. Richardson & Associates, Inc.

*John R. McGinley, Jr., Grogan, Graffam, McGinley & Lucchino, P.C.,* for appellee/appellant, Controlled Blasting, Inc.

*Ira S. Lefton,* with him, *Eric Reif, Reed, Smith, Shaw & McClay,* for The Kroger Company.

OPINION BY SENIOR JUDGE BARBIERI, May 3, 1988:

These nine consolidated appeals arise out of four civil actions filed in the Allegheny County Court of Common Pleas following a rockslide alongside of Pennsylvania Route 51, also known as Saw Mill Run Boulevard, in Pittsburgh, Pennsylvania, (City) on February 16, 1983. The Pennsylvania Department of Transportation (PennDOT), Controlled Blasting, Inc. (CBI), and Ram Construction Company (Ram)[1] appeal from the decision

---

[1] Ram filed a cross-appeal from the trial court's order denying its motion for post-trial relief in *Kroger Company v. City of Pittsburgh et al.,* at No. G.D. 83-13357.

of the trial court denying their motions for post-trial relief and an order entering judgment in the four actions.

Prior to February 16, 1983, there had been instances of spontaneous rockslides from the hillside adjacent to Route 51 in Pittsburgh. Pursuant to plans prepared by A. M. Richardson and Associates, Inc. (Richardson), the City undertook a construction project involving removal of a rock overhang for the purpose of stabilizing the hillside. The City retained Ram as the general contractor to correct the hazardous condition. Ram chose CBI to perform blasting which was required to displace the rock overhang.

Prior to commencing the construction project, the City obtained a highway occupancy permit from PennDOT which allowed it to occupy the cartway of Route 51 during the course of the project and to establish temporary lanes of travel adjacent to the site for motorists.

On February 16, 1983, after Ram had released traffic which it had been holding back during blasting periods, a rockslide occurred on the hillside along Route 51 in an area where CBI had set off an explosion approximately seven or eight minutes earlier. A Ram employee, Andrew Burgan, was operating a bulldozer under the rock overhang when the rockslide occurred. Burgan was struck by falling rock and killed. Thomas Apitsch, a police officer for the City, sustained injuries jumping from fallen debris during the rescue effort after the rockslide. An automobile owned by Cramer Reclamation, Inc. and a truck owned by the Kroger Company were damaged by falling debris while traveling on Route 51 at the time the rockslide occurred.

The defendants in the *Burgan* action were the City, CBI, and Richardson. PennDOT was joined as an additional defendant. The City settled the matter for $250,000.00. The *Apitsch* action was filed against Ram,

CBI, and Richardson. PennDOT was joined as an additional defendant in this action as well.[2] Ram settled this personal injury suit for $319,843.81. Ram, CBI, and Richardson were named as defendants in the *Cramer* action and PennDOT and the City were joined as additional defendants. The City, CBI, PennDOT, Ram, and Richardson were named as defendants in the *Kroger* action.[3] The City and Ram settled the *Cramer* suit for $2,609.44. Apparently Richardson subsequently reached a settlement with Ram and the City in these actions. There was no settlement of the *Kroger* action but the parties stipulated that the plaintiff was entitled to a verdict against any defendants found liable by the jury for $42,046.62 plus delay damages. Ram filed a cross-claim in the *Kroger* action for damage to its bulldozer. The parties stipulated that the damages to the bulldozer in the rockslide amounted to $48,332.00.[4]

In light of the settlements and the stipulations with regard to the *Kroger* case, the four actions went to a jury on the issue of liability for purposes of contribution. The jury answered special interrogatories which were molded by the trial court to reflect a finding that

[2] Ram was not an original defendant in the *Burgan* action as it was the employer of the plaintiff's decedent. Ram was joined as an additional defendant in *Burgan* by CBI for purposes of indemnity. The City was not named as a defendant in the *Apitsch* action as it was the employer of the plaintiff police officer.

[3] PennDOT engineers, Roger Carrier and Raymond Hack, were named as either original or additional defendants in all four actions as well as in Ram's cross-claim. By way of a consent order dated December 3, 1985, these defendants were dismissed.

[4] An employee of the *Kroger* Company, Robert Hilditch, filed an action in the U.S. District Court for the Western District of Pennsylvania for personal injuries he sustained during the rockslide while traveling on Route 51 in a vehicle belonging to the Kroger Company. The damage to this vehicle is the basis of the *Kroger* action before us.

the City, Richardson and PennDOT were negligent and CBI was strictly liable. Ram was found both negligent and strictly liable.[5] The trial court, by orders dated December 17, 1985, and December 18, 1985, entered monetary verdicts as to all defendants in accordance with the jury's findings. PennDOT, CBI and Ram filed post-trial motions. In its opinion and order dated November 3, 1986, the trial court denied all the post-trial motions except for one, striking that part of its December 17, 1985, order apportioning the settlements and revised the contribution among the joint tort-feasors in order to reflect the fact that the obligations owed the plaintiffs in the *Burgan, Apitsch,* and *Cramer* cases had been satisfied.

On appeal, PennDOT contends that the trial court erred in holding that the claims against it were not barred by sovereign immunity and in not holding that the highway occupancy permit, associated regulations and Section 541 of the State Highway Law[6] place responsibility on either the City or Ram to regulate traffic and protect the public during the construction project. PennDOT also contends that the trial court erred in concluding it was not entitled to indemnification from

---

[5] The jury apportioned negligence to the various parties as follows:

| *Cramer* | *Kroger* |
|---|---|
| City—52% | City—52% |
| Richardson—14% | Richardson—14% |
| Ram—10% | Ram—10% |
| PennDOT—24% | PennDOT—24% |

| *Apitsch* | *Burgan* |
|---|---|
| Ram—41% | City—58% |
| Richardson—24% | Richardson—22% |
| PennDOT—35% | PennDOT—20% |

[6] Act of June 1, 1945, P.L. 1242, *as amended,* 36 P.S. §670-541.

the City and that the charge to the jury was improper. PennDOT further maintains that the trial court's method of apportioning liability was improper and the judgment should be modified to reflect an alternative method of apportionment.

CBI raises three issues for our review. It contends that the trial court erred in refusing to enforce an indemnity provision between it and Ram and alternatively that the trial court should have submitted the question of whether CBI's employees were borrowed servants of Ram to the jury. CBI also questions the trial court's method of allocating liability for purpose of contribution.

On its cross-appeal, Ram argues that the trial court erred by concluding its cross-claim for damages to its bulldozer was barred.

We will address CBI's contentions first. Rather than entering into a subcontract, CBI and Ram executed a Service Agreement on February 1, 1983. The agreement provided that during the course of the project, the employees and equipment were to be considered as employees and equipment of Ram subject to its "sole supervision and control" and that Ram was to assume sole and absolute responsibility for the result of the services or work of such employees. The Service Agreement further provided that Ram was to:

> indemnify and hold harmless the CBI-Controlled Blasting, Inc., its employees and agents, from any and all liabilities, damages, losses or claims of any character, whether caused by negligence or otherwise, as a result of injuries to any property, any person or the said customer [Ram] from such services or work (excepting only liability for injury or death of CBI-Controlled Blasting, Inc. employees).

The trial court ruled as a matter of law that CBI's employees were not borrowed servants of Ram. The court also ruled that the Service Agreement was unenforceable as it was entered into for the purpose of evading equal employment requirements and that CBI failed to fulfill the terms of the agreement[7] resulting in a failure of consideration for Ram's promise to indemnify.

CBI contends that the trial court erred by refusing to submit to the jury the question of whether its employees were borrowed servants of Ram and in concluding the Service Agreement was unenforceable. We disagree. As our Supreme Court stated in *Mature v. Angelo,* 373 Pa. 593, 595, 97 A.2d 59, 60 (1953):

> The crucial test in determining whether a servant furnished by one person to another becomes the employe of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it. (Emphasis deleted.)

It is true that where the record will support different inferences as to whether the lending or borrowing employer or both is in control at the time of the accident, the question is one for the jury. *Lane v. Schacht,* 260 Pa. Superior Ct. 68, 393 A.2d 1015 (1978). However, in the instant case, the facts belie the language of the Service Agreement as to Ram being in control of the blasting.

CBI supplied the explosives, equipment to both transport and detonate the explosives, blasting mats, tools, a warning siren and personnel to operate the equipment. The employees from CBI who were en-

---

[7] The trial court held that contrary to the terms of the Service Agreement, the blasting was, in effect, a CBI operation.

gaged in blasting determined how much explosive to use. When the blasters were ready to blast they would tell the Ram employees who would set up flagmen to stop traffic. The blasters would check the site after the blast and give the Ram employees an "all clear" signal when traffic could be resumed. Although Ram drilled the blast holes, CBI actually instructed Ram as to the spacing and number of holes to be drilled.[8]

CBI's vice president, Daniel Brian Conn, testified that he was the project manager. As project manager Conn who was compensated by CBI, stated he was responsible for "setting up the project", appointing a blaster in charge and periodically inspecting the project.[9] Conn testified further that his responsibilities as project manager included reviewing "the manner in which blasting was being done" and to identify safety hazards and working procedures.[10]

CBI points out that Daniel L. Conn, Jr., president of CBI, testified that Ram paid the blasters at the project site. The record reveals that the employees who engaged in blasting were paid by Ram during the course of the project but remained on CBI's payroll and continued to receive benefits from CBI. One CBI employee who was salaried, endorsed his paychecks from Ram over to CBI. CBI employees were not always on the site but were called in by Ram pursuant to a blasting schedule. CBI paid these employees for working hours other than those spent at the project site.[11]

---

[8] Notes of Testimony from December 3, 1985, (N.T.) at 14-19, 32.

[9] N.T. at 91-96.

[10] N.T. at 97.

[11] Notes of Testimony from December 6, 1985, (N.T. III) at 388-389.

Industrial Board regulations place restrictions on blasting operations. These restrictions include the following:

> A *licensed blaster shall be in charge of and responsible for the preparation for, and the firing of, any blast.* The blast shall be fired only by the blaster in charge. Where more than one licensed blaster is engaged in the preparation for a blast, the operations management shall designate the blaster in charge. The blaster in charge may authorize a laborer or other person not qualified to perform general blasting operations to load and unload explosives, prepare explosives for use in blasting, transport explosives at or near a job site, charge explosives into drill holes, and set fuses and detonating wires; *all such duties shall be performed only under the direct supervision and direction and in the presence of the blaster in charge, who is responsible for the conduct of the persons acting under his direction.*

34 Pa. Code §5.7(a) (emphasis added).

The very nature of blasting requires an expertise which mandates against a finding that another can control the manner in which the blaster performs his work.[12] Therefore, the trial court correctly ruled as a matter of law that CBI employees were not borrowed servants of Ram.

CBI argues that the indemnity clause in the Service Agreement is valid and enforceable. A contract will not be construed to indemnify a party for its own negligence, unless such a provision is expressed in unequivo-

---

[12] On cross-examination, Daniel L. Conn, Jr., admitted that the blaster must use his own expertise in determining if the drill holes are proper as well as how much and what type of explosive to use. He testified further that a blaster is in charge of his own work. N.T. III at 392 and 401.

cal terms. *Perry v. Payne,* 217 Pa. 252, 66 A. 553 (1907).[13] We disagree with CBI's contention that the indemnity language in the Service Agreement clearly expresses the parties' intention for Ram to indemnify CBI for the latter's negligence. Preceding the indemnity language, the Service Agreement states that Ram agrees as follows:

> that, while engaged in said work, [CBI's] employees and equipment are and shall be, on each occasion, to all intents and purposes, the employees and equipment of the said customer and subject to said customer's sole supervision and control in all respects, and that all work and services so performed shall be at the sole *risk and responsibility of the said customer [Ram]*. (Emphasis added.)

Therefore, although the indemnity clause provides that Ram is to indemnify CBI for damages caused by "negligence or otherwise" as a result of injuries from services provided, the wording of the agreement imposes liability for Ram's negligence as it is the party said to have control over the blasting services. The language of the contract does not clearly and unequivocally provide that indemnification is due CBI for damages resulting from its own negligence. *See, Westinghouse Electric Co. v. Murphy, Inc.,* 425 Pa. 166, 228 A.2d 656 (1967), (enforcing indemnity clause which expressly provided for indemnification of a buyer by a seller for the negligence of the buyer or its employees).

---

[13] This holding has been followed in *Dilks v. Flohr Chevrolet,* 411 Pa. 425, 192 A.2d 682 (1963), *Brotherton Construction Co. v. Patterson-Emerson-Comstock, Inc.,* 406 Pa. 400, 178 A.2d 696 (1962), *Pittsburgh Steel Co. v. Patterson-Emerson-Comstock Inc.,* 404 Pa. 53, 171 A.2d 185 (1961); and *DiPietro v. City of Philadelphia,* 344 Pa. Superior Ct. 191, 496 A.2d 407 (1985).

As we previously discussed, CBI and not Ram was actually in control of the blasting on the project. Therefore as the lower court held, the agreement was a sham and unenforceable as there was no consideration for Ram's promise to indemnify.

There is a further reason for refusing to enforce the indemnity provision contained in the Service Agreement. The agreement provided that Ram was to indemnify CBI for "negligence or otherwise"; in this case-strict liability. Here CBI is strictly liable for damages resulting from blasting, an ultra-hazardous activity.

The Industrial Board regulations concerning blasting set forth licensing requirements for blasters[14] and restrictions on blasting operations[15] in order to "safeguard the public and the lives, limbs, and health of workers in blasting operations."[16] Permitting blasters to contract away their strict liability through an indemnity clause would weaken incentives to employ utmost safety precautions for protection of the public. Therefore, even if the Service Agreement met the test set forth in *Perry, i.e.* provided in clear and unequivocal terms for CBI to be indemnified for its own *negligent* acts, CBI is not entitled to such indemnification for damages incurred while performing an ultra-hazardous activity such as blasting which imposes *strict liability.*

We now turn to PennDOT's contention that the actions against it are barred by sovereign immunity. We have held that it was the intent of the General Assembly in enacting the sovereign immunity statute at 42 Pa. C. S. §8522, to waive the Commonwealth's immunity only in "specific, clearly-stated situations" and that therefore the enumerated exceptions to immunity must

---

[14] 34 Pa. Code §§5.3-5.5.
[15] 34 Pa. Code §5.7.
[16] 34 Pa. Code §5.1.

be strictly construed. *Davidow v. Anderson*, 83 Pa. Commonwealth Ct. 86, 91, 476 A.2d 998, 1000 (1984).

The trial court held that PennDOT was liable pursuant to the exception to sovereign immunity contained in 42 Pa. C. S. §8522(b)(4). This subsection provides for liability to be imposed against the Commonwealth for "[a] dangerous condition of . . . highways under the jurisdiction of a Commonwealth agency." The trial court based its determination on the fact that PennDOT issued the highway occupancy permit (permit) knowing that the stabilization project involved blasting.

Route 51 is a Commonwealth highway and the City owned the hillside adjacent to the northbound lanes where the blasting took place. The permit simply allowed the City and Ram to occupy the northbound lanes of Route 51 and to construct a temporary pavement contiguous to the outside of the southbound lanes to create one lane of traffic in each direction. Contrary to the trial court's opinion, the issuance of the permit did not constitute approval of the particulars involved in the City's stabilization project.

CBI, Ram, and the City urge us to conclude that this case is controlled by our decision in *Mistecka v. Commonwealth*, 46 Pa. Commonwealth Ct. 267, 408 A.2d 159 (1979). There we reversed judgments on pleadings in favor of the Commonwealth and held that averments of a continuing history of rocks being thrown from a local highway overpass down onto a state highway so as to injure travelers thereon, constituted a dangerous condition of a highway for purposes of 42 Pa. C. S. §8522(b)(4).

In *Mistecka*, the Commonwealth had prior knowledge of the rock throwing but failed to remedy the situation. While there was a history of spontaneous rockslides from the hillside adjacent to Route 51, the injuries here occurred not as a result of these spontaneous slides but as a result of blasting in a direct attempt on

the part of the City to remedy the situation. Further, we recently noted, our Supreme Court's holding in *Mascaro v. Youth Study Center*, 514 Pa. 351, 523 A.2d 1118 (1987), casts serious doubt over the continuing validity of our decision in *Mistecka. See, Rippy v. Fogel*, 108 Pa. Commonwealth Ct. 296, 529 A.2d 608 (1987) (holding that a history of collisions between automobiles and deer on a stretch of Commonwealth highway of which the Commonwealth had knowledge was not a dangerous condition of a highway under the jurisdiction of a Commonwealth agency for purposes of 42 Pa. C. S. §8522(b)(4)).

*Mascaro* involved the real property exception to local governmental immunity in the Political Subdivision Tort Claims Act at 42 Pa. C. S. §8542(b)(3). The Supreme Court there held that immunity was waived under this exception only where the artificial condition or defect of the property itself caused the injury and not where it merely facilitated the injury through the acts of third parties. Here, the acts of third parties, *i.e.* the City, Ram, and CBI combined to cause the rockslide on February 16, 1983, which spilled over onto Route 51.

We noted in *Rippy* that although *Mascaro* addressed the question of the real estate exception to the immunity of political subdivisions and *Mistecka* involved the immunity of the Commonwealth, the similarities of the real property exceptions at §8522(b)(4) and §8542(b)(3) raise serious doubts as to the continued validity of *Mistecka*.

However, before we can even reach the question of whether the construction project constituted a dangerous condition of the highway for purposes of 42 Pa. C. S. §8522(b)(4), we must find that the damages arose out of a negligent act on the part of PennDOT, "where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were

caused by a person not having available the defense of sovereign immunity." 42 Pa. C. S. §8522(a).

Ram, CBI, and the City contend that PennDOT was negligent for failing to inspect or supervise the construction site and for failing to close the road during the course of the City's project.[17] However, these appellants have failed to cite any statutory or common law duty on the part of PennDOT to either supervise a local construction project adjacent to a Commonwealth highway or to close the roadway during the course of any such project. Ram and the City do cite Section 2002(a)(11) of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §512(a)(11), which provides that it is PennDOT's duty "[t]o superintend, supervise and control the work of constructing, reconstructing, maintaining and repairing State designated highways." This provision refers to PennDOT's duty with regard to the actual surface of the roadway and not to a project undertaken by a municipality on its own property and is therefore not a basis for finding negligence pursuant to §8522(a).

Nor do we accept the argument raised by Ram and the City that Section 541 of the State Highway Law (Law) places a duty on PennDOT to close Route 51 during the course of the City's hillside stabilization project. Section 541 provides that the taking over of a street in a city of the second class such as Pittsburgh by the Commonwealth for maintenance or improvements shall not be construed as placing a duty on PennDOT to regulate traffic or the use by the traveling public of the roadway. Section 541 does provide that PennDOT is authorized to close streets taken over as state highways during such times as improvements are being made thereon. It further states that the city is responsible for establishing a

[17] We note that the trial court's charge to the jury with regard to PennDOT's liability is limited to these two allegations of negligence.

detour in accordance with Section 548 of the Law, 36 P.S. §670-548. This section provides that the city shall establish a detour while improvements are made to the surface of the roadway pursuant to Section 542 of the Law, 36 P.S. §670-542. Section 542 addresses repairs and construction of roadways at the *expense of the Commonwealth*. Therefore, Section 541 of the Law addresses the situation where the Commonwealth takes over a roadway and makes repairs and improvements to the surface at its own expense. This is not the situation we are faced with.[18]

The City, Ram, and CBI would have us impose on PennDOT the herculean task of inspecting and/or supervising every local project which requires the issuance of a highway occupancy permit. The project which resulted in the rockslide on February 16, 1983, was a contractual undertaking on the part of the City which owned the hillside adjacent to Route 51. The record reveals that Richardson provided the City with various options for correcting the problem but the City chose blasting which happened to be the most cost-efficient method.[19] After relying on the advice of its engineer, the City applied for the highway occupancy permit. In issuing the permit, PennDOT was simply allowing the City to attempt to stabilize the hillside in accordance with the recommendations of its engineer.

We will not impose on PennDOT, which has jurisdiction over the surface of the roadway, a duty to oversee the work on all projects by municipalities requiring a highway occupancy permit. Such a holding would not be in line with the legislative intent behind the excep-

---

[18] Even if PennDOT had a duty to close the highway, its failure to do so would not be a factor in Burgan's death as he would still have been working at the project site.

[19] Notes of Testimony from December 4, 1985 (N.T. II) at 170.

tions to sovereign immunity. As there was no duty on the part of PennDOT to inspect and/or supervise the project or to close the roadway, the trial court erred in refusing to grant its motion for judgment notwithstanding the verdict. In light of our disposition on the sovereign immunity issue, we need not reach the other questions which PennDOT raises.

We recognize that we are remanding this matter to the trial court with directions that it conduct a new trial minus PennDOT as a party defendant. However, we feel that in the interests of judicial economy we should exercise our advisory role by addressing two of CBI's contentions concerning the jury's verdicts and the trial court's manner of molding these verdicts in apportioning contribution.

In addition to those contentions discussed previously herein, CBI maintains that the jury's verdicts in the four consolidated cases were inconsistent with each other and that the trial court improperly allocated contribution among the tortfeasors by failing to consider Ram as strictly liable when molding the verdicts.

With regard to the first of these contentions, CBI notes that the jury attributed different percentages of negligence to Ram in the *Cramer* and *Kroger* cases than in the *Apitsch* case. It also points out differing percentages of negligence attributed to PennDOT in both the *Burgan,* and *Apitsch* cases as opposed to the *Cramer* and *Kroger* actions. We do not feel the verdicts are inconsistent. The jury's apportionment of negligence among the various defendants in the *Cramer* and *Kroger* actions is identical. This is most likely explained by the fact that both actions were for property damage. In *Apitsch*, the plaintiff police officer may not have been at the accident scene if the roadway had been closed and therefore the issue of failure to do so could have been controlling. The plaintiff's decedent in *Burgan* would have been there whether or not the roadway had been

closed so the jury could have considered other issues more important in this case, such as the decision to employ blasting to displace the rock overhang rather than some other method to correct the dangerous condition.[20]

Although causes of action may be consolidated for trial, they remain distinct causes of action. In order for a verdict to be deemed inconsistent, there must be inconsistencies within each independent action rather than between verdicts in separate and distinct actions. *Gould v. Nickel,* 268 Pa. Superior Ct. 183, 407 A.2d 891 (1979).

CBI also questions the manner in which the trial court molded the verdicts in the four cases. CBI does not take issue with the trial court's initial determination that the award should be divided into as many portions as parties who were found liable and should be allocated among the negligent parties in accordance with their percentage of negligence. For example, in *Burgan,* there were four defendants. CBI was found strictly liable and therefore responsible for 25% of the award. Negligence was apportioned to the remaining parties pursuant to the Comparative Negligence Act (Comparative Act) 42 Pa. C. S. §7102, as follows: City—58%; Richardson—22%; and PennDOT—20%. The trial court apportioned 75% of the total award or $187,500.00 among these three defendants in accordance with the percentage of causal negligence attributed to them.[21]

---

[20] A review of the record reveals that Richardson suggested at least three different methods of eliminating the rockslides. One suggestion was to erect a short retaining wall, another was to erect a high wall and then backfill, and the third was blasting to remove the rock overhang. N.T. II at 168-170.

[21] The city settled the *Burgan* action for $250,000.00. Therefore, CBI would owe the City 25% of the settlement or $62,500.00; Richardson would owe the City 22% of $187,500.00, or $41,250.00; and PennDOT would owe the City 20% of $187,500.00 or $37,500.00.

CBI claims however, that the trial court should have treated Ram as being strictly liable and responsible for 20% of the damages in *Cramer* and *Kroger*.[22] Since it did not do so, CBI maintains that Ram was awarded more contribution than it was entitled to in these two cases. CBI does not take issue with the trial court's calculations in *Apitsch* and *Burgan,* as in those cases the percentage negligence attributed to those parties which it maintains should be held strictly liable, (*i.e.* Ram in the *Apitsch* action and the City in the *Burgan* action), exceeded their pro-rata amount of liability.

The trial court's allocation of liability is an attempt to comport with both the Uniform Contribution Among Joint Tortfeasors Act, (Uniform Act), 42 Pa. C. S. §§8321-8327 and the Comparative Act, 42 Pa. C. S. §7102(b).[23]

The trial court explained the rationale behind its apportionment of contribution as follows:

As to the relationship of all joint tort-feasors we conclude that they are equally liable for a pro rata share. As to the relationship of those liable on the theory of ordinary negligence, we conclude that as among themselves they may seek contribution in that percentage the jury found each to be negligent.[24]

---

[22] All five defendants were named in *Cramer* and *Kroger* as these claims were not affected by workmen's compensation defenses.

[23] §7102(b), states in pertinent part:

[w]here recovery is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal *negligence* to the amount of causal *negligence* attributed to all defendants against whom recovery is allowed. (Emphasis added.)

[24] Opinion and order of Judge SMITH dated November 3, 1986, at 9.

Although the trial court opinion notes that Ram was held liable both on theories of strict liability as well as negligence theories, the opinion goes on to treat Ram as liable only on the latter theory for purposes of molding the verdict. Thus CBI, being strictly liable, was held liable for a pro rata share while Ram, which was found both negligent and strictly liable was held responsible for that percentage of the remainder of the award which the jury attributed to it. For example, CBI was liable for 20% of the award in *Cramer* and *Kroger*[25] while Ram was responsible for only 10% of the remaining 80% of the award.

Although the causes of action against Ram were brought on strict liability and negligence, the jury found that the blasting was a substantial factor in causing the plaintiff's injuries. In *Federoff v. Harrison Construction Co.*, 362 Pa. 181, 66 A.2d 817 (1949), our Supreme Court adopted the rule of liability without fault for damages resulting from blasting contained in Section 519 of the Restatement of Torts.[26]

In treating Ram as negligent for purposes of contribution the trial court required Ram, who was found strictly liable and negligent, to pay less of the total verdict than CBI which was found strictly liable only.

We suggest that a more workable means of apportioning liability in this instance is that of "comparative contribution" adopted by the Pennsylvania Superior Court in *McMeekin v. Harry M. Stevens, Inc.*, 365 Pa. Superior Ct. 580, 530 A.2d 462 (1987).

In *Svetz v. Land Tool Company*, 355 Pa. Superior Ct. 230, 513 A.2d 403 (1986), the Superior Court held that the Uniform Act permitted contribution among

---

[25] Five party defendants were involved in these two actions.

[26] A comparable section appears at Section 484 of the Restatement (Second) of Torts.

strictly liable defendants and negligent defendants, finding that both are joint tort-feasors within the meaning of the Act.[27] In *McMeekin,* the Superior Court was faced with the question of apportioning contribution in such a situation. In that case, the defendant held liable on a theory of negligence, appealed claiming that in charging the jury that it could assess a percentage of causal liability between the negligent and strictly liable defendants, the trial court improperly applied the Comparative Act. The Superior Court held that although the Comparative Act does not extend to actions other than those sounding in negligence the Uniform Act is applicable where a tortfeasor is found liable for negligence and another is found strictly liable.[28] The court went on to hold that in this type of situation, the Uniform Act permits apportionment of contribution based on comparative fault of each.

Applying the doctrine of comparative contribution to the case at hand would permit the jury to determine the percentage of liability attributable to the blasting (Ram and CBI) as well as the percentage of liability attributable to the remaining negligent tort-feasors. This method of apportionment would appear to be particularly suited to a situation where a tort-feasor such as

---

[27] The Superior Court based this conclusion on the wording of 42 Pa. C. S. §7102(b) which speaks in terms of negligence only and decisions by our Supreme Court such as *Lewis v. Coffing Hoist Division,* 515 Pa. 334, 528 A.2d 590 (1987), *Azzarello v. Black Brothers Company, Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978) and *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975).

[28] *See also, Rabatin v. Columbus Lines, Inc.,* 790 F.2d 22 (3rd Cir. 1986), holding that Pennsylvania Supreme Court would apply the Uniform Act to enforce contribution between a tort-feasor found liable on a strict liability theory and a tort-feasor found liable on a theory of negligence.

Ram is held liable on a theory of negligence as well as strict liability. For example, if at a subsequent trial Ram is found to be negligent on some basis as well as strictly liable for blasting, the jury could consider both aspects of liability in arriving at a percentage of liability for contribution purposes.[29]

Ram also raises a question for our review. Its contention is that the trial court erred by holding that since it was a joint tort-feasor, the cross-claim in the *Kroger* action against PennDOT, CBI, and Richardson[30] for its bulldozer was barred. By way of a stipulation dated November 27, 1985, the parties agreed that the bulldozer was damaged as a result of the rockslide in the amount of $48,332.00.

Ram maintains its cross-claim is an independent cause of action and that the trial court erred in holding that since Ram was a tort-feasor its claim was barred. Ram further contends that the trial court should have permitted it to recover on its cross-claim as long as its negligence did not exceed the combined negligence of the other defendants. Ram's cross-claim was brought pursuant to Pa. R.C.P. 2252(a) which provides as follows:

Rule 2252. Right to Join Additional Defendants

(a) In any action the defendant or any additional defendant may, as the joining party, join

---

[29] In *McMeekin*, the Superior Court observed that the jury must first determine whether the parties are at fault and if so it must then determine the common liability or amount in damages due the plaintiff. Only after this has been done should the jury determine what percentage of liability is to be attributed to each tort-feasor. As noted by the court, this approach will serve to maintain the distinction between the respective liabilities of the tort-feasors and the right of contribution. In the case at hand, the defendants have stipulated to the common liability.

[30] Ram filed its Amended Answer With New Matter asserting its cross-claim pursuant to Pa. R.C.P. 2252(d).

as an additional defendant any person whether or not a party to the action who may be alone liable or liable over to him on the cause of action declared upon by the plaintiff or jointly or severally liable thereon with him, or *who may be liable to the joining party on any cause of action which he may have against the joined party arising out of the transaction or occurrence or series of transactions or occurrences upon which the plaintiff's cause of action is based*. (Emphasis added.)

Pa. R.C.P. 2255(a) provides that the procedure between the joining party and the additional defendant shall be the same as if the joining party were a plaintiff and the joined party a defendant.

The issue which Ram raises is whether a defendant, sued on theories of strict liability as well as negligence, may assert a separate cause of action from that which forms the basis of the plaintiff's lawsuit, against additional defendants.

It is true that the independent acts of CBI and Richardson along with those of Ram, contributed to the plaintiff's damages in *Kroger* as well as to those suffered by Ram itself. We would not prohibit a plaintiff who was contributorily negligent to recover on a cause of action as long as recovery is permitted under the Comparative Act. However Ram, placed in the position of plaintiff pursuant to Pa. R.C.P. 2255(a), is not only negligent but strictly liable as well.

It has been held that a strictly liable defendant may join additional defendants on a theory of negligence in order to recover contribution. *Svetz, Rabatin*.[31] Howev-

---

[31] The Pennsylvania Superior Court in *Svetz*, specifically noted that it did not reach the question of the effect of the Comparative Act on contribution between strictly liable and negligent tortfeasors.

er, the holding in *Svetz* is clearly limited to the issue of contribution under the Uniform Act. There the court stated:

> The focus of the Uniform Act is on the relationship existing between tortfeasors rather than the manner in which several tortfeasors have been held liable to an injured claimant. [citation omitted]. In Puller v. Puller, 380 Pa. 219, 221, 110 A.2d 175, 177 (1955), the Supreme Court observed that 'contribution is not a recovery for the tort [committed against the plaintiff,] but the enforcement of an equitable duty to share liability for the wrong done.' . . . Thus, a tortfeasor's right to receive contribution from a joint tortfeasor derives not from his liability to the claimant but rather from the equitable principle that once the joint liability of several tortfeasors has been determined, it would be unfair to impose the financial burden of the plaintiff's loss on one tortfeasor to the exclusion of the other.

*Svetz* at 238, 513 A.2d at 407. The court observed that by allowing a strictly liable tort-feasor to recover contribution from additional defendants who are negligent it was merely furthering the Uniform Act's goal of achieving equity among tort-feasors without subverting the policies behind strict liability.

Ram is asserting a cause of action seeking to recover for a tort arising out of the same events upon which it has been sued by the plaintiff on theories of strict liability and negligence. Therefore, as we are not dealing with a contribution action, the Comparative Act rather than the Uniform Act is applicable. We agree with the Superior Court's holding in *McMeekin* that the Comparative Act does not include conduct which is other than negligent. A *strictly liable* plaintiff is not entitled to re-

covery diminished in proportion to that amount of *negligence* attributed to it.

Since the jury found that blasting was a substantial factor in causing the rockslide, Ram, being strictly liable, would not be able to recover on its cross-claim. The trial court erred in refusing to charge the jury on this matter though since there was evidence before the jury which it could have used to support a finding that blasting did not cause the rockslide. Therefore, it was possible that Ram might not be found strictly liable for the plaintiffs' injuries. However, the error was not prejudicial to Ram as the jury found blasting was a substantial factor.

In summation, we hold that the trial court did not err in refusing to enforce the indemnity provision in the Service Agreement between Ram and CBI and in holding that CBI's employees were not borrowed servants of Ram. We further hold that the trial court erred in concluding that PennDOT was not immune pursuant to the real property exception to sovereign immunity found at 42 Pa. C. S. §8522(b)(4). We suggest that on re-trial of this matter the trial court apply the doctrine of comparative contribution and charge the jury as to Ram's cross-claim in case blasting is not found to be a substantial factor in causing the plaintiffs' injuries.

A new trial is required in light of the fact that PennDOT was improperly held liable when it was entitled to sovereign immunity. Accordingly, we reverse the order of the trial court dated November 3, 1986, and remand the matter to the said court for a new trial without PennDOT as a party defendant.

### ORDER

AND NOW, this 3rd day of May, 1988, the order of the Allegheny County Court of Common Pleas in the above-

captioned matter, dated November 3, 1986, is reversed and the matter is remanded to said court for proceedings consistent with this opinion.

Jurisdiction relinquished.