In re LaBRUM & DOAK, LLP, Debtor.

LaBRUM & DOAK, LLP, a Pennsylvania General Partnership, Plaintiff,

v.

Perry S. BECHTLE, Esquire, Michael G. Brennan, Esquire, Gerard Bruderle, Esquire, R. Michael Carr, Esquire, Leslie M. Cyr, Esquire, Zachary R. Estrin, Esquire, Carl R. Fogelberg, Esquire, Thomas P. Grace, Esquire, James O. Hausch, Esquire, Jonathan D. Herbst, Esquire, James D. Hilly, Esquire, Barbara L. Hollenbach, Esquire, Mary M. Jacobs, Esquire, William F. Keating, Esquire, Douglas J. Kent, Esquire, J. Stephen Kreglow, Esquire, Michael Krekstein, Esquire, John F. Ledwith, Esquire, John D. Lucey, Jr., Esquire, Edwin F. McCoy, Esquire, Kean K. McDonald, Esquire, William J. McKee, Esquire, Scott H. Mustin, Esquire, James Neeley, Esquire, Peter J. Neeson, Esquire, John J. Osorio, Esquire, Samuel J. Pace, Jr., Esquire, David J. Parsells, Esquire, Jan M. Ritchie, Esquire, Daniel J. Ryan, Esquire, John E. Salmon, Esquire, Peter Silver, Esquire, Stephen J. Springer, Esquire, Robert J. Stern, Esquire, Robertson Taylor, Esquire, Ronald J. Uzdavinis, Esquire, Patrick R. Vitullo, Esquire, John L. White, Esquire, Merle Wolfson, Esquire, and United States of America Department of Treasury Commissioner of Internal Revenue, Defendants.

Bankruptcy No. 98–10215DAS.
Adversary No. 98–0217DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

July 30, 1998.

Lawrence J. Tabas, Obermayer, Rebmann, Maxwell & Hippel, LLP, Philadelphia, PA, for BECII—1818 Ltd.

J. Scott Victor, Saul, Ewing, Remick, Saul, LLP, Philadelphia, PA, for John M. Bernard, Esq.

Barry E. Bressler, Pelino & Lentz, P.C., Philadelphia, PA, for Liberty Property L.P.

David Searles, Donovan, Miller, LLP, Philadelphia, PA, for Kellie Allen.

John J. Winter, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for John Daley.

Evan Harrison Snyder, Feldman & Pinto, Philadelphia, PA, for Helen Parise.

Kevin W. Walsh, Adelman, Lavine, Gold & Levin, PC, Philadelphia, PA, for John D. Lucey.

Thomas P. Wagner, Rawle & Henderson, LLP, Philadelphia, PA, for Rawle & Henderson.

Matthew R. Sorrentino, Tallman, Hudders & Sorrentino, Allentown, PA, for Tallman, Judders & Sorrentino.

Paul J. Scarlato, Weinstein, Kitchenoff, Scarlato & Goldman, Philadelphia, PA, for Weinstein, Kitchenoff, Scarloto & Goldman.

Gregg L. Zeff, Frost & Zell, Philadelphia, PA, for Frost, Syzamanski & Zeff.

James E. O'Neill, III, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Stradley, Ronon, Stevens & Young.

Joseph Diorio, Philadelphia, PA, for Peter Neeson, Stephen J. Springer & John E. Salmon.

Robert Lapowsky, Wayne, PA, for Michael J. Carr & David J. Parsells.

Michael J. Menkowitz, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Kean K. McDonald.

Robert M. Kline, Philadelphia, PA, for CNA Insurance Co.

Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, for Perry S. Bechtle, Esq. & Daniel Ryan, Esq.

Gregory S. Hrebiniak, Tax Division—CTS Eastern, Washington, DC, for Internal Revenue Service.

David Smith, Schnader, Harrison, Segal & Lewis, LLP, Philadelphia, PA, Robert J. LaRocca, Ryan, Brown, McDonnell, Berger & Gibbons, Philadelphia, PA, Joseph Riga, Whittlesdey, McDowell & Holtz, Maple Shade, NJ, for Ryan Brown.

Frederic Baker, Assistant U.S. Trustee, Philadelphia, PA, for U.S. Trustee.

Neal D. Colton, Mark E. Felger, Philadelphia, PA, for Debtor.

Aris J. Karalis, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Creditors' Committee.

Paul J. Winterhalter, Philadelphia, PA, for Petitioners, Former Partners' Committee, and Various Defendants.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before us in the instant bankruptcy case of a dissolved law firm is the disposition of an adversary proceeding ("the Proceeding") instituted by the Debtor to obtain a declaratory judgment approving its proposed allocation of tax recapture liability under 26 U.S.C. § 467 of the Income Tax Code (" § 467") to all of its partners and former partners who received the benefit of the recapture, as opposed to only the partners who remained with the Debtor at its dissolution.

Reiterating that we have jurisdiction to decide this issue, we sustain, for the most part, the position of the Debtor on the theory that a valid implied contract in fact supports the Debtor's allocation. The only exception is our holding that, as to a partner with whom the Debtor negotiated what we find is a valid post-dissolution settlement agreement, that partner's liability is limited by the terms of the agreement.

### B. FACTUAL AND PROCEDURAL HISTORY

LABRUM & DOAK, LLP ("the Debtor"), is a Pennsylvania general partnership which formerly was engaged in the practice of law for over ninety years. On June 5, 1997, the Debtor's remaining partners voted to dissolve the firm, effective July 31, 1997, and on the latter date the firm ceased its practice.

On January 6, 1998, an involuntary bankruptcy petition for relief under Chapter 7 of the Bankruptcy Code was filed against the Debtor by six former partners, John J. Seehousen, Michael H. Krekstein, Paul M. Silver, Patrick J. Vitullo, William McKee, and Scott Mustin. On January 22, 1998, in response to a motion of January 7, 1998, by the Debtor, we entered an order converting the case to Chapter 11.

The Debtor filed its initial Plan of Reorganization and Disclosure Statement on February 17, 1998. Shortly thereafter, on March 4, 1998, it filed Adversary Proceeding No. 98–0134 ("Adv. 134"), seeking to obtain all or a portion of fees recovered by its former attorneys in contingent-fee cases initiated by the firm prior to its dissolution. On April 20, 1998, it initiated the Proceeding before us.

At subsequent hearings on the Disclosure Statement on March 17, 1998, continued to April 29, 1998, and later to June 10, 1998, the Debtor's counsel indicated that the disposition of these proceedings was critical to the development of its plan of reorganization. However, at a further status hearing on July 22, 1998, in response to our suggestion, see In re LaBrum & Doak, LLP, 1998 WL 404301, at *6 (Bankr.E.D.Pa. July 15, 1998) ("Labrum II"), that the reorganization should lead rather than follow the disposition of litigation, the Debtor indicated an intention to file, by August 7, 1998, an amended plan, hopefully with the joinder of the Official Committee of Unsecured Creditors ("the UC Committee").

This change of priorities may be crucial to a prompt resolution of this case. Adv. 134 has not yet been decided, as the briefing on

it was just completed on July 24, 1998. Also pending in the case are two other major adversary proceedings: (1) Adversary Proceeding No. 98–0273 ("Adv. 273"), prosecuted by the UC Committee and seeking to recover all or a portion of fees recovered by its former attorneys in hourly-fee matters or cases initiated by the firm prior to its dissolution, filed on May 22, 1998, and in which we filed *Labrum II, supra,* in denying motions of several of the Defendants to dismiss that proceeding; and (2) Adversary Proceeding No. 98–0393 ("Adv. 393"), prosecuted by the Official Committee of Former Partners ("the FP Committee"), which seeks to avoid certain 1997 distributions to the then-remaining partners as fraudulent transfers, which was filed on July 15, 1998. It is unclear when all of the foregoing litigation will be completed.

In response to the Complaint filed in the instant Proceeding, many of the thirty-nine (39) partners and former partners who were named as Defendants, along with the Internal Revenue Service ("the IRS"), initially filed Answers. However, the parties who have actively litigated the Proceeding against the Debtor have boiled down to the FP Committee, representing numerous Defendants individually as well; Kean K. McDonald, a former partner; and, to a limited degree, the IRS.

The FP Committee and McDonald each initially filed motions to dismiss the Proceeding, challenging this court's jurisdiction to hear it under 11 U.S.C. § 505(a) and 28 U.S.C. § 1334(b). They argued that the Proceeding did not fall within § 505(a) and could not conceivably effect the administration of the estate for purposes of § 1334(b), *see Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984), because the parties ultimately liable for the taxes at issue were the individual partners, not the Debtor.

In an Order/Memorandum reported at 1998 WL 295542 (Bankr.E.D.Pa. June 1, 1998) (*"Labrum I"*), we denied the motions to dismiss. Therein we pointed out *Quat-trone Accountants, Inc. v. Internal Revenue Service,* 895 F.2d 921, 924–27 (3d Cir.1990), established in this Circuit that § 505(a) was not a limitation on a bankruptcy court's jurisdiction. Secondly, analyzing "related to" jurisdiction under 28 U.S.C. § 1334(b), we held that the Debtor's responsibility to file and defend the § 467 tax allocation made in its returns rendered the matter not only "related to" this case, citing *Belcufine v. Aloe,* 112 F.3d 633, 630–37 (3d Cir.1997); and *In re Wolverine Radio Co.,* 930 F.2d 1132, 1149 (6th Cir.1991), but also possibly "core" under 28 U.S.C. §§ 157(b)(2)(A) and (b)(2)(O).

The facts relevant to the Proceeding began unfolding in 1992, when the Debtor signed a written lease ("the Lease") dated August 20, 1992, with 1818 Market Partnership ("the Landlord"), for the rental of two floors of an office building at 1818 Market Street, Philadelphia, Pennsylvania. The term of the Lease commenced September 1, 1992, and extended through August 31, 2002. As an alleged incentive to the Debtor to enter into the Lease, the Landlord abated the rent for the first through twelfth (12th) months, the nineteenth (19th) through the twenty-fourth (24th) months, the thirty-first (31st) through the thirty-seventh (37th) months, and eleven days in the thirty-eighth (38th) month of the Lease, which effectively deferred the greater part of the rent to the second half of the Lease's term.

In 1994 the Debtor's then-accountant advised the Debtor to adopt the method of accounting for the Lease set forth in § 467, because the Lease qualified as a "467 Rental Agreement." Although the Debtor had previously used a cash basis method for its accounting, § 467 calls for a "constant rental accrual" method of accounting, which effectively prorates the total rents due under the Lease over the entire length of the Lease for tax purposes. This methodology allowed the Debtor to increase its tax deductions for rental expenses during the first four years of the lease, which effectively reduced taxable income to the Debtor's partners in that period. Once the free rent periods expired, however, the Debtor was required to pay its rent obligations as contractually agreed under the

Lease, although its rent expense deductions were limited to the constant rent deduction rate previously established. This effectively increased the taxable income of the Debtor's partners during that period. Also, in response to the adoption of the § 467 method of accounting, the Debtor apparently filed amended tax returns for 1992 and 1993 and issued amended Schedule K–1's to the partners, allowing them to file amended returns with the greater deductions and thereby obtain tax refunds.

During 1995 and 1996 a large number of the Debtor's partners left the firm by either withdrawal or, in the case of Defendants PERRY S. BECHTLE and DANIEL J. RYAN, retirement due to advanced age. The 1996 tax year was the first year in which the Debtor was required to limit its rental expense tax deductions to less than the amount it actually paid for rent, essentially requiring the partnership to recognize additional income in order to recapture the additional deductions it had taken during the first four years of the Lease.

In January 1997, several months before the Debtor's tax return for the tax year 1996 was due, the partners remaining with the Debtor, depleted by resignations, voted to adopt an amendment ("the First Amendment") to the Amended and Restated Partnership Agreement of the Debtor, dated January 1, 1989 ("the PA"), claiming that this First Amendment was retroactive to January 1, 1996. The First Amendment expressly allocated to each present and former partner whose equity in the firm had not been completely liquidated a share of the tax recapture income that was to be recognized in the tax years 1996—2002 proportionate to the ratio between the actual aggregate additional deductions each individual partner had been claimed in tax years 1992—1995 and the actual aggregate deductions of all of the partners. However, for partners who retired or otherwise terminated their interest in the Debtor, the First Amendment provided that the total amount of the tax recapture income that would be allocated to them throughout the 1996—2002 period would be accelerated

and allocated to them in the years that they received returns of capital from the Debtor, with the percentage of their tax recapture income which they would be allocated in a year being the same as the percentage of their capital account that was distributed in that year.

In April 1997, the remaining partners voted to approve another amendment to the PA ("the Second Amendment"), also purportedly retroactive to January 1, 1996. The Second Amendment clarified that the allocations of additional income which were to effect the tax recapture were for tax purposes only and would not change the partners' book capital accounts. Of the former partners who retired or withdrew prior to the dissolution vote of June 5, 1997, apparently only Defendants Bechtle and McDonald signed the First Amendment, and there is no evidence that any of the former partners, including Bechtle or McDonald, signed the Second Agreement.

Effective July 31, 1997, the Debtor dissolved. As its space needs were greatly reduced to only those necessary to house a dissolution team, it negotiated with the Landlord to vacate most of its space and reduce its rent. However, as a result, all of the tax deductions which were to be recaptured over the period through to 2002 became due in 1997. Thus, the 1997 tax liability was unexpectably large.

A number of the Debtor's former partners hired an accountant who disputed the validity of the allocations by the Debtor's present accountant of the tax recapture income to them, which was reflected in returns filed by the Debtor in October 1997. Some or perhaps all of these disputing parties have filed formal objections to the Debtor's tax returns with the IRS. The IRS has not issued an opinion on the formal objections.

The trial of the Proceeding on June 3, 1998, and June 4, 1998, featured the testimony of G. Daniel Jones, the Debtor's accountant; Christopher H. Washburn, the accountant retained by the disputing partners; the Debtor's dissolution partner, Peter Neeson; the Debtor's administrative partner from 1992 through 1997, James O. Hausch; and

McDonald. The accountants were observed to be equally impressive in their credentials and equally firm and logical in their reasoning. However, our resolution on Pennsylvania contract law principles concerning which both accountants offered virtually no opinions renders their testimony an instructive backdrop, but one which was not in any sense decisive of the ultimate issues. No evidence or even suggestions of misconduct by Hausch or Neeson emerged. *But see* Adv. 393, as described at page 35 *infra.* McDonald focused on his particular post-dissolution negotiations with the Debtor's counsel, although he was also cross-examined about the pre-dissolution discussions of the § 467 issue by the firms' management team.

After the trial, any interested parties were accorded until June 22, 1998, to file Opening Briefs and until July 2, 1998, to file Reply Briefs. The Debtor and McDonald offered two submissions and the FP Committee and the IRS filed Opening Briefs only. In retrospect, these Briefs devoted inordinate attention to the ultimately inconclusive issue of whether the First and/or the Second Amendments were valid. Consequently, the instant decision relies principally upon our independent research and analysis.

## C. DISCUSSION

1. *We Reiterate the Propriety of the Exercise of Our Jurisdiction to Hear and Determine What We Now Deem Is a Core Proceeding.*

McDonald once again, joined by the IRS, argues that § 505(a) of the Bankruptcy Code does not grant the Court the right to establish tax liability for nondebtors in the Proceeding. McDonald cites, as he did earlier, *Pacor, supra;* and *Quattrone, supra.* The IRS cites only to *American Principals Leasing Corp. v. United States,* 904 F.2d 477 (9th Cir.1990).

■ We reiterate and reaffirm our decision in *Labrum I* that the *Debtor's* obligation to allocate the tax liability of its partners and former partners on its returns, albeit that the ultimate payment responsibility lies with the partners, renders the matters at issue "related to" the Debtor's bankruptcy for purposes of 28 U.S.C. § 1334(b), since it is not only conceivable but quite apparent that resolution of this issue is critical to the administration of this case. We acknowledge the reasoning of *American Principals, supra,* 904 F.2d at 480–82, that § 505(a) limits a bankruptcy court's jurisdiction to matters which involve actual tax liability of the debtor in a fact setting comparable to the instant Proceeding. However, *Quattrone, supra,* 895 F.2d at 924–26, which we must follow in this Circuit, reasons expressly to the contrary.

We note that the position of the IRS appears contrary to its interests, irrespective of the result. A definitive decision on the issue of allocation of the liability among parties likely to be equally financial capable of satisfying their determined liability would appear to serve the IRS's interest. Moreover, in light of our ultimate decision exculpating McDonald from most of his·potential liability, *see* pages 763–65 *infra,* it is difficult to see how McDonald's interests are prejudiced by our acceptance of jurisdiction of the Proceeding, either.

■ At this stage, we must also decide whether the Proceeding is core, in order to ascertain whether we may hear and determine the Proceeding, *see* 28 U.S.C. § 157(b)(1), or may merely hear it and render proposed findings and conclusions to the district court for determination. *See* 28 U.S.C. § 157(c)(1). None of the parties raised this issue at trial and only the Debtor, arguing·that the matter is core under 28 U.S.C. §§ 157(b)(2)(A) and (b)(2)(*O*) per our suggestions in *Labrum I,* at *2, addresses it in briefs. Observing that no arguments urging a contrary result have emerged, we now conclude that the Debtor's proper filing of its tax returns is of great importance to administration of its estate, rendering the Proceeding core under 28 U.S.C. § 157(b)(2)(A). We will therefore proceed to determine the Proceeding on its merits.

2. *The Debtor's First and Second Amendments to the PA Do Not Appear Validly Enacted So as to Bind the Former Partners to Their Terms.*

Perhaps the most hotly-contested issue during the trial and in the parties' briefing was the validity of the First and Second Amendments to the PA. Although the amendments were clearly adopted by the remaining partners after many former partners had retired or withdrawn, the Debtor claims they are nevertheless totally binding on the former partners.

The Debtor justifies this result by appealing to 26 U.S.C. § 761(c) and 26 C.F.R. § 1.736–1(a)(1)(ii). Section 761(c) of the Internal Revenue Code ("the IRC") thusly provides a definition of "Partnership Agreement:"

> for purposes of this subchapter, a partnership agreement includes any modifications of the partnership agreement made prior to, or at, the time prescribed by law for the filling of the partnership return for the taxable year (not including extensions) which are agreed to by all the partners, or which are adopted in such other manner as may be provided by the partnership agreement.

Section 1.736–1(a)(ii) of the Treasury Regulations provides that "[a] partner retires when he ceases to be a partner under local law. However, for the purposes of subchapter K, chapter 1 of the IRC, a retired partner or a deceased partner's successor will be treated as a partner until his interest in the partnership has been completely liquidated." It is the Debtor's contention that § 761(c) allows retroactive amendments to partnership agreements to be effective for federal tax purposes and that § 1.736–1(a)(ii) of the Regulations transforms the former partners into "tax partners" who continue to be bound by the PA, including any amendments thereto retroactive to their departure.

▆ We find that Pennsylvania partnership law controls our determination of whether the amendments to the PA are valid modifications of the partners' rights. "Federal income tax liability follows ownership. In the determination of ownership, state law controls." *United States v. Mitchell,* 403 U.S. 190, 197, 91 S.Ct. 1763, 29 L.Ed.2d 406 (1971). Legal interests and rights which are important in establishing federal tax liability are created by and under state law. *See Morgan v. Commissioner of Internal Revenue,* 309 U.S. 78, 80–81, 60 S.Ct. 424, 84 L.Ed. 585 (1940). It is only how these interests or rights shall be taxed which is determined by federal law. *See id. See also Yonadi v. Commissioner of Internal Revenue,* 21 F.3d 1292 (3rd Cir.1994); and *Sennett v. Commissioner of Internal Revenue,* 752 F.2d 428, 431 (9th Cir.1985).

▆ "Under Pennsylvania law the rights and duties of partners is to be determined pursuant to the Partnership Agreement." Post–Trial Memorandum of the Official Committee of Former Partners and other Individual Former Partners Supporting Defenses Raised Against Debtor's Complaint for Declaratory Judgment on the 467 Tax Allocation ("FP's Memo"), at 5, citing 15 Pa.C.S. § 8331. A written partnership agreement setting out the terms of the partnership and the duties and privileges of the parties is a contract and must therefore be interpreted according to state contract law. "A true partnership relation flows from a contract between the parties." *O'Donnell v. McLoughlin,* 386 Pa. 187, 191, 125 A.2d 370, 372 (1956). "In the absence of a countervailing prohibition of the law or the intervening rights of third persons, the provision of such a contract is the law of the partnership between the partners." *Id. See also In re Argus Group 1700, Inc.,* 206 B.R. 737, 749 n. 21 (Bankr.E.D.Pa.1996) (noting that a partnership agreement is a contract and citing *McClimans v. Barrett,* 276 Pa.Super. 557, 561–62, 419 A.2d 598, 600 (1980), which held that "[a] partnership agreement as a contract must be interpreted in accordance with the intent of the parties and each part of the contract must be taken into consideration and given effect."); *In re Fineberg,* 202 B.R. 206, 221, 222–25 (Bankr.E.D.Pa.1996) (characterizing a cause of action based in a part-

nership agreement as a contract); *In Re Ingleside Associates*, 136 B.R. 955, 962 (Bankr.E.D.Pa.1992) (referring to a partnership agreement as a "contractual relationship" in finding that proposed "amendments and modifications to the partnership agreement, *as those to any other contract,* may be so substantial as to justify denial of confirmation under 11 U.S.C. § 1129(a)(1) and (a)(3)")(emphasis added); and 68 C.J.S. 406 (1980) ("A partnership inter sese does not arise out of the operation of law but out of the contract of the parties.").

■ Since a partnership agreement is a contract, it requires consideration to be enforceable. *See McCullough v. Barr*, 145 Pa. 459, 22 A. 962 (1891) (holding that it is essential that consideration shall support an agreement of partnership); and 68 C.J.S., *supra,* at 413–14 ("A contract of partnership must be founded on some legal consideration. Whatever will constitute a consideration in the case of other contracts will likewise constitute consideration in the case of a partnership agreement."). The consideration for a partnership contract is often the mutual binding of the partners' time, effort, and capital to benefit each other through the conduit of the partnership. *See Chaiken v. Employment Security Comm'n*, 274 A.2d 707 (Del.Super.1971) (holding that mere contribution of work and skill can be valuable consideration for a partnership agreement); and 68 C.J.S., *supra,* at 413–14.

■ The contractual nature of a written partnership agreement leads to the conclusion that any amendment to the original contract will require additional consideration. *See* 68 C.J.S., *supra,* at 420 ("modification or variation [of a partnership contract] must be supported by consideration"). While the present partners arguably bound each other with an additional obligation with the Amendments, none of the former partners benefitted from the Amendments because the firm's obligations to them were fixed as of the time that their relationship with the Debtor was terminated by the terms of the

PA. *See* Articles 12.2.2, 14.6, 16.2 thereof. The First and Second Amendments added no new obligations on the part of the present partners to the former. In fact, the Debtor, in its post-trial reply brief, characterizes the Amendments as "merely confirmatory of the underlying allocation agreement among all Debtor's then-existing partners." Debtor's Post–Trial Reply Memorandum in Support of the Award of Declaratory Relief Sur Debtor's Allocation of Internal Revenue Code Section 467 Tax Liability ("Debtor's 2nd Memo"), at 7.

To the extent that the Debtor argues that there was a pre-existing duty on the part of all of the partners to accept the § 467 tax recapture liability, it is precluded from arguing that a "confirmatory" promise was a new obligation of the present partners to the former partners sufficient to serve as consideration for the amendments. *See Cohen v. Sabin*, 452 Pa. 447, 453, 307 A.2d 845, 849 (1973) ("Clearly performance of that which one is already legally obligated to do is not consideration sufficient to support a valid agreement"). Pennsylvania law does recognize an exception to the "pre-existing duty rule" when there is a bona fide compromise of a disputed claim. *Id.* ("it is equally clear that a compromise of a doubtful or disputed claim is proper and that 'surrender or compromise of a doubtful claim and forbearance to sue thereon is sufficient consideration.' "). However, in the present matter, the Amendments cannot be characterized as a compromise, given the Debtor's description of them as "confirmatory" and their application to former partners who had no part in their ratification. For these reasons, the First and Second Amendments are both invalid and unenforceable due to the lack of valid consideration for them.

Since we can make our decision on contract-law grounds without consideration of the Amendments, we find it unnecessary to address McDonald's argument that the First Amendment contained a condition precedent which was unfulfilled, or the argument of the IRS that the Debtor is using the plain language of 26 C.F.R. 1.736–1(a)(ii) out of its correct context in its characterization of payments to its former partners.

3. *The Terms of the PA, Exclusive of the Purported Amendments, While Supportive of a Result in Favor of the Debtor as to Most of the Former Parties, Appear Insufficient to Support a Decision.*

■ In contrast to the Debtor's implicit reliance on the PA in its argument that the foregoing Amendments thereto are valid and controlling terms, the FP Committee claims that the Defendant former partners' "right to participate in future profits or corresponding losses were [sic] clearly and unequivocally contractually terminated ." FP's Memo, at 7. If true, the force of this argument would reach beyond the validity of the Amendments to demonstrate a contractual limitation on the liability of the former partners which would prevail over the Debtor's equity-based arguments for its proposed allocation. After correctly noting that "Pennsylvania law mandates a recognition of the rights and responsibilities established under the Partnership Agreement," FP Memo, at *id.*, asserts that "[t]he Partnership Agreement specifically provided under Articles 12.2.2 and 16.2 that terminated partners or partners who withdrew were no longer entitled to participate in profits or losses."

However, upon our examination of the PA, it is clear to us that the Articles of the PA referenced above refer only to future profits and future losses originating after the dates of partners' separations, since those terms occur in the context of provisions for fixing a partner's ownership interest in the firm as of the date of separation in order to liquidate it. Nevertheless, even if the former partners could not claim a portion of the profits or losses of the Debtor as a matter of right after they were separated from the firm, they could still be allocated certain liabilities under Article 19.7, entitled "LIMITATIONS ON LIABILITY: INDEMNIFICATION," which specifically addresses liabilities extending past the date of partners' separations.[1] After defining "Losses" to mean "any and all actions, causes of action, litigation, claims, debts, dues, accounts, demands, losses, defi-

ciencies, damages, liabilities, obligations, and expenses of any nature whatsoever ... arising from or in connection with or in any manner relating to the partnership;" "Excepted Losses" to mean generally willful misconduct or breach of a written Partnership Agreement; and "Pending Claims" to be "any Losses pending against or known to the partnership or a partner at the time of such partner's voluntary withdrawal or expulsion from the partnership," ¶ 19.7(b) of the PA goes on to provide as follows:

> Upon the termination of the interest of a partner in the partnership by reason of death, disability, or retirement, then the partnership and the remaining partners shall assume and satisfy as they become due and shall defend, indemnify and hold harmless such deceased, disabled or retired from, any and all Losses with the sole exception of such partner's Excepted Losses. The Executive Committee shall determine in its sole discretion the manner and extent, if any, to which such deceased, disabled or retired partner shall bear his Excepted Losses.

This indemnification provision is extremely broad, given the earlier exhaustive definition of "Losses," and the language is not discretionary except as to "Excepted Losses." Since the liability for the tax recapture involved no misconduct and was not the subject of a valid separate agreement, it could be argued that the tax recapture would be covered by the intent of ¶ 19.7(b), and indemnification of all retired partners from liability would follow.

However, ¶ 19.7(b) applies only to living partners who have terminated their partnership interests in the Debtor by "retirement ." The only former partners to which this characterization applies are Bechtle and Ryan. Both of these Defendants chose to allow the FP Committee to represent their interests in the Proceeding at hand, despite the considerable involvement of Ryan's new firm in Adv. 134. Thus, neither Bechtle nor Ryan offer any defense based on ¶ 19.7(b) of the PA.

---

1. The FP Committee may have overlooked the relevance of this provision of the PA due to their exclusive reliance on the description of the PA provided in the Report of their expert Washburn.

We also note that, contrary to the assertion of the FP Committee in the FP Memo, the PA itself was introduced into the record as Exhibit D-1. *See* Trial Transcript of June 3, 1998, at 9, 201.

Furthermore, we ultimately conclude that the subsequent implied contract in fact includes both of these Defendants. *See* pages 761–63 *infra.*

The PA section which appears applicable to non-retiree former partners is ¶ 19.7(c), the analysis of which is more complex than that of ¶ 19.7(b) in its application to the Proceeding. In significantly less sweeping language than is contained in ¶ 19.7(b), ¶ 19.7(c) provides for indemnification to withdrawn and expelled partners for "ordinary business expenses, ordinary obligations, and ordinary liabilities of the partnership … with the following exceptions:"

(i) The Executive Committee shall have the right in its sole discretion to determine the portion or amount of any loans, lease obligations, Pending Claims, and Excepted Losses to be assessed against and borne by such expelled or withdrawing partner. It is the intention of the parties that any expelled or withdrawing partner shall remain liable for the share of Pending Claims and Excepted Losses which could have been assessed against and borne by such partner had such partner remained a partner after the date of withdrawal or expulsion; and

(ii) The partnership shall have no obligation to defend, indemnify, and hold harmless any such expelled or withdrawing partner from any Pending Claim or Excepted Losses, except to the extent of insurance coverage provided by the partnership's applicable insurance policies, and such withdrawal or expulsion shall not exonerate or release any such partner from liability to the partnership or to any third party with respect to any Pending Claims or Excepted Losses.

We find that the central feature of the § 467 constant accrual method of rental accounting is that, by taking additional deductions early in the Lease, the partnership was obligated to recognize and report additional income later in the Lease term. Given the exhaustive listing of sub-types of liabilities, the definition of "Losses" cited above is broad enough to support the argument that the parties intended to include this type of deferred tax liability among the obligations which the parties intended to be continued to be borne by a withdrawn partner. Consequently, far from providing a contractual preclusion of an equitable allocation of the tax recapture to the former partners, § 19.7(c) may instead provide a basis for the Debtor's argument that the partners had a preexisting agreement which covered the tax liability issue.

Having determined that the former partners cannot successfully appeal to the original contract to claim a right not to be allocated a liability, we are led to address the issue of whether or not the PA, without the Amendments, gives the Debtor a right to allocate the tax recapture income to the former partners who withdrew rather than retired. The quoted language of ¶ 19.7(c) gives the Debtor's Executive Committee the power to allocate pending claims and indicates a presumption that the Executive Committee would do so. Before we could find that the PA gives the Debtor the immediate right to make the allocation it seeks, however, we must first determine whether the tax liability at issue qualified as a "pending claim" by reason of notice of the obligation to the partners and then find whether the Executive Committee exercised its contractual power to allocate same.

All three of the partners who testified at the trial agreed that there was a common understanding among the partners that they were incurring a future obligation when they deferred the Debtor's tax liabilities under § 467. The testimony of Hausch and Neeson credibly supported the assertion of the Debtor that "[e]ach partner was advised and agreed that in addition to reaping the tax benefit during the early years of the Lease, when the actual rent expense was lower than the rental deduction taken for tax purposes, the same partner who enjoyed this benefit would be responsible for the eventual tax burden in the later years of the lease when the actual rent expense would exceed the allowable rental tax deduction." Debtor's Post–Trial Memorandum of Law in Support of the Award of Declaratory Relief Sur Debtor's Allocation of Internal Revenue Code Section 467 Tax Recapture Liability ("Debtor's 1st Memo"), at 19.

McDonald opposed the Debtor's request for relief generally. However, he testified that he and other partners knew of the liability, but that he thought that there was a mechanism of withholding which removed the burden of preparing for the tax liability from the partners as individuals so as to prevent last-minute attempts by departing partners to shift responsibility for the tax liability to the remaining partners. He apparently came to this conclusion because it was recognized that the remaining partners might have trouble coming up with the full amount at once. He further testified that "what was decided was that there would be a fund established whereby money would be segregated for individuals to pay this tax. And the key point as I recall it, was that the remaining partners wanted to have this fund available for the departing partners so that the departing partner would not be in a position to object." Trial Testimony of June 4, 1998 ("T.T. II"), at 12–13. Later, during McDonald's cross-examination by the Debtor's counsel, McDonald clarified his understanding of the tax recapture liability:

Mr. Colton [the Debtor's counsel]: And is it your testimony that you, as a member of the executive committee, did not understand that each partner had a recapture obligation?

Mr. McDonald: No. And I didn't testify that way. I testified that that issue was raised at the meeting.

Q: And what did the recapture concept mean to you?

A: Well, it meant a problem for any individual who was going to have to pay them within a short period of time. And it created a question about how the individual would be able to meet that—that obligation. *Id.* at 31–32.

The former partners offered no testimony to indicate that others of their number had a different understanding. Noting that, as experienced lawyers, all of the partners were parties sophisticated in the law, we find that the partners were aware that the Debtor was incurring a deferred obligation when it adopted the § 467 constant rental accrual method of accounting for its lease payments.

However, given the lack of evidence and argument on the topic, we are reluctant to conclude that the Debtor's Executive Committee ever exercised the power given it by the PA in ¶ 19.7(c). It could perhaps be argued that Neeson, as the Debtor's dissolution partner, succeeded to the powers of the Executive Committee. However, the PA is silent on this point and there is no evidence relevant to it in the record. Furthermore, we believe that the parties all entered into an implied contract in fact which superceded or modified the pre-existing PA. *See* pages 761–63 *infra.* We would nevertheless point out that, except as to Bechtle and Ryan, the terms of the PA, exclusive of the purported Amendments, could easily be read to support the Debtor's position.

4. *The Requisite High Standard of Evidence Necessary to Support an Oral Contract Claim Is Absent.*

■ The testimony of the witnesses referenced at pages 759–60 *supra,* which indicates that the partners were aware of their deferred tax liability, is also relied upon by the Debtor to support its theory of an oral contract. Debtor's 1st Memo, at 14–16, 20–21. "Where the writing contains an express provision that it constituted the entire contract between the parties and should not be modified except in writing, the party seeking to show subsequent oral modification ... must prove it by clear, precise, and convincing evidence...." *Nicolella v. Palmer,* 432 Pa. 502, 508, 248 A.2d 20, 23 (1968). This test was adopted in *First Nat'l Bank v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 280 (3rd Cir.1987). Since the PA contains an integration clause at ¶ 19.10, we are bound to use *Nicolella '*s test to find a subsequent oral contract among the partners.

■ Although we have already found that the partners were aware that the adoption of the § 467 method of accounting meant that the Debtor was incurring a deferred tax obligation, we must also weigh the testimony of Hausch and Neeson that the § 467 adoption was addressed at a series of meetings and the somewhat different understanding of how the withholding mechanism was to work testified to by McDonald. Given the picture

that emerges of partners raising different concerns and proposals about a reasonably complex tax issue over the course of several days or, more likely, weeks, without any evidence that one oral formulation of the parties' intention was openly assented to, we are unable to find that there is clear, precise, and convincing evidence that the partners came to an express oral agreement.

5. *We Nevertheless Do Find That All of the Partners Agreed to Accept the Deferred Tax Liability Under Implied Contract in Fact.*

 Although we found, at pages 760–61 *supra*, that the evidence of the partners' statements and conduct during the course of the meetings referred to by the witnesses at trial was too insubstantial to find more than that the meetings were held and certain issues were raised and discussed, we conclude that there is sufficient evidence of the partners' subsequent conduct for us to find a contract implied in fact under the less demanding standards of proof to support that theory. In *Ingrassia Construction Co. v. Walsh*, 337 Pa.Super. 58, 67, 486 A.2d 478, 483 (1984), the court held that "[a] contract implied in fact can be found by looking to the surrounding facts of the parties' dealings. Offer and acceptance need not be identifiable and the moment of formation need not be pinpointed," citing RESTATEMENT (SECOND) OF CONTRACTS § 22(2) [,at 66 (1981) ]. *See also Cameron v. Eynon*, 332 Pa. 529, 3 A.2d 423 (1939); and *Crawford's Auto Center, Inc. v. Commonwealth Pennsylvania State Police*, 655 A.2d 1064 (Pa. Cmwlth.1995), *appeal denied*, 542 Pa. 651, 666 A.2d 1059 (1995). We also note our own statement in *In re Pennsylvania Footwear Corp.*, 204 B.R. 165, 176 (Bankr.E.D.Pa. 1997), that "a course of conduct can result in an implied contract where the conduct of the parties occurs under circumstances which, according to the ordinary course of dealing and common understanding of men, show that there was a mutual intention to enter a contract," citing *Westinghouse Electric Co. v. Murphy, Inc.*, 425 Pa. 166, 171–72, 228 A.2d 656, 659 (1967).

 The relevant conduct and circumstances from which we infer an implied in fact contract in the instant setting are as follows: (1) the intention of the partners as expressed in ¶ 19.7(c) of the PA, *see* page 759 *supra*, that withdrawing partners would remain liable for pending claims; (2) the Debtor's adoption of the § 467 constant rental accrual method of accounting after its discussion at several partner meetings; (3) the behavior of the partners in allowing the holding back of money from their distributions of profits; and (4) the parallel testimony of Neeson, Hausch, and McDonald that the partners shared an understanding that there would eventually be a recapture of the tax benefits that the Debtor had previously claimed on the partners' behalf. The most reasonable construction of the foregoing is a recognition of an implied agreement that the partners understood that they were individually liable for the recapture of the tax benefit which they had received and that they agreed to the withholding of money from their cash distribution and its retention in their capital account in order to make sure that partners who left in the middle of the Lease had the wherewithal to pay their tax obligations.

The strongest evidence for this implied contract is that the partners all apparently tolerated the open withholding of large sums of money from their cash distributions of profits for the purpose of preparing for the eventual § 467 tax recapture. McDonald testified that he thought the withholding procedure was the solution to the problem of "how the individual would be able to meet that ... obligation" and that he believed that approximately $30,000.00 had been withheld from his compensation for that purpose. T.T. II, at 32, 36. McDonald also testified that the Debtor provided written notice of the withholding amounts: "I believe that the firm did on...one or two-year occasions provide a simple sheet that set forth amounts of money that were being withheld from the partners." *Id.* at 37.

We find it hard to imagine that such sophisticated parties would have allowed any such deductions from their compensation unless they knew that the funds were being

withheld to cover a liability for which they acknowledged responsibility. Thus, we find that, after agreeing on the individual liability issue, the partners tried to reduce their risk of having to allocate recapture income in the future to a withdrawn or expelled partner in the face of that partner's opposition, possibly resulting in an expensive lawsuit, by allowing the retention by the Debtor of the untaxed profits flowing from the additional deductions in the early years of the Lease. We can infer that the rationale behind this holdback plan was that, barring calamity to their holdback account, if a partner left before the end of the lease term, that party would be allocated an accelerated tax recapture in the form of additional income at approximately the same time they would be receiving the value of their earlier tax benefits. Thus, a former partner unable to pay would be given the means to do so when the taxes came due and an unwilling partner would find it difficult to contest the validity of the allocation of income when that partner was simultaneously receiving the matching real income. Indeed, the contingency which the partners tried to plan for has come about anyway, i.e., that, when there was no present cash income being distributed to offset the previous tax liability, the partners who had left in the interim balked at paying. Unfortunately, a calamity as to the holdback account also occurred, and it was depleted prior to the Debtor's dissolution.

This point lies behind McDonald's testimony that he had understood the holdback account was to be a cash account. Although his brief does not make the explicit argument, it is clear that he believes that, absent a matching cash disbursement, he was not obligated to recognize the additional income. However, this argument ignores the central, implied agreement of the parties. Wherever the holdback account was supposed to be kept, the relevant fact is that it was a risk management device adopted as a consequence of the partners' recognition of their individual liabilities. There was no evidence that the holdback account was intended to act as some kind of general release of tax liabilities, but only that it was meant to enable a former partner to pay the taxes on accelerated recapture income. If the money had been deposited in an actual cash account in a bank and the money had been lost because the bank had failed, we would still have the same case: we would have former partners who would be very unhappy at the prospect of having to pay taxes on income that they never realized as cash. The fact that the present partners are in the same bind is not enough to make up for the financial pain resulting from the depletion of this cash. The decision to reserve the money in the equity of the firm turns out to have been a bad one, but it was surely an understandable approach at the time to discount the seemingly unlikely but actual occurrence that the firm would become insolvent before the partners could reclaim their capital accounts and in itself is not evidence of any kind of bad faith.

We note, of course, that the reserve funds have been depleted. We also recognize that the FP Committee and certain among its constituency question the circumstances under which the depletion occurred. However, this record contained no evidence of any improprieties or bad faith by Hausch, Neeson, or any other managerial partner of the Debtor in the depletion of these reserves. To the extent that any such claims exist, they are probably going to be subject to recovery in Adv. 393. Thus, if any redistribution of the consequences of the depletion are to ensue, Adv. 393 must be the vehicle to do so. The depletion does not change the fact that all of the interested parties effectuated a contract implied in fact to repay the tax benefits previously received and that the reserve account was a device to assist them in doing so.

We also note that Bechtle and Ryan presented no evidence that they excepted themselves from the scope of this implied contract in fact. We find that the subsequent implied contract in fact modified the provisions of ¶ 19.7(b) of the PA which might otherwise be read in their favor.

In any event, we do not think that the confusion about where the withheld funds were to be kept or even if they were depleted and in what circumstances are sufficient bases to overcome our conclusion that there was

a real meeting of the minds among all of the partners on the issue of the partners' recognition of their individual liability and their decision to protect themselves by allowing the withholding of their money. We therefore conclude that the Debtor is entitled to prevail, for the most part, on a theory of implied contract in fact.

6. *Although We Do Not Ultimately Rely upon Same, We Agree with the Debtor that Its Equitable Arguments Support Its Claims.*

The Debtor devotes considerable energy to the advancement of arguments that the equitable theories of the "tax benefit rule," "unjust enrichment," and recognition of an "implied contract at law" support its position. Unfortunately, it cites no caselaw in support of the application of these theories to the instant facts. On the other hand, none of the Defendants cite any caselaw to support their arguments that equitable grounds are inappropriate bases for a decision in the Proceeding.

Since we are able to make our decision on the legal grounds by finding an enforceable contract implied in fact to support the Debtor's claim, and the parties have not advanced much in the way of authority for these equitable arguments, we decline to rule on these issues. We will note, however, that our review of *Hillsboro Nat'l Bank v. Commissioner of Internal Revenue Service*, 460 U.S. 370, 381–82, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983), appears to support the Debtor's position. In that case, the Court held that "[t]he purpose of the [tax benefit] rule ... is to approximate the results produced by a tax system based on transactional rather that annual accounting." *Id.* It then went on to note that "[i]t has long been accepted that a taxpayer, using accrual accounting who accrues and deducts an expense before it becomes payable and who for some reason eventually does not have to pay the liability must then take into income the amount of the expense earlier deducted." *Id.* This case appears to support the Debtor's position. As Jones arguably testified, an approximation of transactional accounting would seem to draw our attention directly on those who claimed the allocated additional deductions. Moreover, since the partnership is not a taxpaying entity, the "taxpayer using accrual accounting" in the present case would be each individual partner. However, as we do not choose to rely on these grounds for our decision, we will devote no further attention to them.

7. *Nevertheless, the Debtor Is Bound by the Terms of Its Subsequent Valid Settlement of McDonald's Liability, Which Restricts His Liability to the Taxes to be Recaptured in 1996.*

Having found that, generally, all of the partners who withdrew prior to the dissolution remain liable for the tax recapture of all of the deductions occasioned by the § 467 method of accounting on the basis of an implied contract in fact which was supported by, but was formulated after, the adoption of the PA, we must address the issue of whether McDonald's alleged settlement with the Debtor on the basis of negotiations which occurred after and hence allegedly modified that implied contract was a valid and binding settlement. The Court notes that, on this issue, McDonald has carefully analyzed the issue in terms of the relevant contract law and cited authority in support of his position, which could not be said of most of the other submissions, requiring this court to engage in independent analysis and research to reach its result.

The issues of contract law relevant to McDonald's settlement are whether the Memorandum from the Debtor's counsel to, *inter alia*, McDonald, dated November 11, 1997 ("the 11/11 Memo"), incorporated by reference the provision of a Memorandum from the Debtor's counsel to, *inter alia*, McDonald of November 4, 1997 ("the 11/4 Memo"), stating a condition subsequent, and whether McDonald's acceptance of the terms set forth in the 11/11 Memo was valid. Essentially, we find McDonald's position as set forward in his initial brief to be persuasive.

The Debtor's counsel, acting for Neeson as the Debtor's dissolution partner, sent the 11/4 Memo to, presumably, all of the Debtor's former partners under the subject line "LaBrum and Doak LLP—Global/Piecemeal

Settlement." This document contained a number of proposals on which a settlement agreement of all or most of the issues raised in the various proceedings which have emerged out of this case could have been based. The fourth of eleven (11) numbered paragraphs in the 11/4 Memo addressed the § 467 Issue. The Debtor's proposal on this issue was that the partners would accept liability for the 1996 tax recapture in exchange for a release from liability for the 1997 tax recapture. The eighth paragraph set forth the Debtor's position with regard to settlements with individuals:

> Recognizing that some of you may find this offer more attractive than others, if there is substantial interest in pursuing a settlement along the terms outlined above, the Firm is prepared to settle the claims of those former partners who are willing to proceed on the terms outlined in this memorandum on an individual basis.

The last part of the 11/4 Memo was an acceptance form which asked the former partners to support or oppose the settlement proposal set forth therein. Those who supported the settlement proposal were advised that, "[b]y checking this box, I am declaring my intent to participate in a settlement with the Firm ... subject to the drafting and signing of appropriate documents incorporating the terms of this proposal." At the bottom of the page, the form stated, "THE FIRM WILL NOT BEGIN DRAFTING SETTLEMENT DOCUMENTS UNLESS AND UNTIL A SIGNIFICANT NUMBER OF THE FORMER PARTNERS RESPOND IN SUPPORT OF THE NOVEMBER 4, 1997 PROPOSAL."

Subsequently, the 11/11 Memo followed, which stated, under the subject line "LaBrum and Doak LLP—Section 467 Proposal," as follows:

> We have been informed by Ed McCoy that "conservatively" at least 15 former partners have filed protests to the Firm's 1996 K–1s allocating Section 467 liability to former partners.

In our ongoing effort to resolve disputes in the most efficient way possible the Firm proposes as follows:

1. Anyone who wants to accept the Firm's November 4, 1997 proposal can do so and both the accepting former partner and the Firm will be bound by the acceptance.

2. Those former partners who do not find the November 4, 1997 Section 467 proposal to be acceptable, join with the Firm to request that the Internal Revenue Service rule on the 467 issue on an expedited basis. Further, the Firm and the former partners participating in the Internal Revenue Service determination will accept the IRS determination as final and binding (although the Internal Revenue Service will not be informed of that agreement).

The benefits of an expedited determination are self-evident. No matter how present and former partners may feel about the many LaBrum and Doak issues, it is in everyone's interest to get every dispute resolved at the earliest possible time.

Please return the attached form to me on or before November 18, 1997 so the firm can move forward with the matter.

The first numbered paragraph of the 11/11 Memo appears to be a clear offer to anyone who was willing to abide by the part of the 11/4 Memo proposal that set forth terms for settlement of the § 467 issue. The Debtor's offer in the 11/4 Memo was, though, conditioned on the acceptance of the entire settlement offer by a "significant" number of former partners.

However, the Debtor's 11/11 Memo presents what appears to be a new offer made in anticipation of the rejection of the 11/4 Memo offer because of the position taken by a majority of former partners on the § 467 issue. The Debtor appears to argue that the offer made in paragraph one of the 11/11 Memo refers to the entire 11/4 Memo offer and so incorporates the condition subsequent of the earlier offer.[2] The argument must fail for two reasons.

▮ First, the 11/11 Memo is obviously a new offer attempting to settle the § 467 issue

---

**2.** The Debtor's argument is difficult to follow in part because it is entirely contained within the last footnote of its reply brief. *See* Debtor's 2nd

Memo, at 15. It also lacks any citations to caselaw or authority of any sort.

alone. Even though the offer of the first numbered paragraph refers to a chance for a binding acceptance of "the Firm's November 4, 1997 proposal," this paragraph is below the subject line "Section 467 proposal," and appears after the statement that there has been a difficulty with the majority of former partners over the § 467 issue, paired with an alternative offer to the former partners addressed to the "former partners who do not find the November 4, 1997 Section 467 proposal to be acceptable." To the extent that the absence of a direct reference to § 467 in the relevant offer adds some ambiguity, that ambiguity should be construed against the drafter when the intent of the offer seems reasonably apparent from the writing. *Cf. Cobaugh v. Klick–Lewis*, 385 Pa.Super. 587, 561 A.2d 1248 (1989) (where a mistake is not mutual but unilateral and is due to the negligence of the party seeking to rescind a contract, relief will not be granted); and *Perry v. Tioga County*, 694 A.2d 1176 (Pa.Cmwlth. 1997) (an offer is a manifestation of willingness to enter a bargain so made and justifies another person's understanding that his assent to that bargain is invited and will conclude it).

The second reason that the Debtor's argument is not persuasive is that, if we were to read the offer in the 11/11 Memo as incorporating the condition subsequent contained in the 11/4 Memo calling for an effective acceptance only if joined in by a "significant" number of former partners, such a condition would directly conflict with the plain language of the offer. The offer is extended to "anyone," and the 11/11 Memo further states that "both the accepting former partner and the Firm will be bound by the acceptance."

■ A reading of an offer that avoids having an implied term which directly contradicts a written term of the offer is preferred. *See* RESTATEMENT (SECOND) OF CONTRACTS, § 203, at 92–93 (1981). Thus, a term limiting the ability of individuals to accept should not be incorporated into an offer by implication when it contradicts the manifested intent in the language of the offer itself. *See Cobaugh, supra* (it is the manifested intent of the offeror and not his subjective intent which determines the persons who have the power to accept an offer).

The Debtor also argues that McDonald's acceptance was ineffective because he did not sign the acceptance form provided with the 11/4 Memo, but instead used the form provided with the 11/11 Memo. The Debtor argues this point in order to find an alternative method of including the condition subsequent, as the condition regarding the use of the form included therewith appears on the first acceptance form. However, the 11/4 Memo form was a specified form of acceptance of the 11/4 offer only if the 11/11 Memo's offer incorporated the entire 11/4 Memo by reference instead of just the terms relating to the § 467 issue. We are unable to agree with the Debtor that this is so, particularly when its counsel drafted the document which created the ambiguity.

Consequently, we find that the Debtor's settlement with McDonald limiting his proportionate share of the 1996 recapture amount is valid and binding.

The mathematics relevant to the Debtor/McDonald dispute makes it clear why the acceptance of this offer was so beneficial to McDonald and make it difficult to understand why more former partners did not accept the Debtor's offers, at least as to the § 467 issue. We note that, except in the contest of McDonald's defense on this ground, no mention of the settlements and the responses of the other former partners thereto are included in the record.

In our mathematical analysis, we will utilize the numbers provided in Exhibit C to the Debtor's Complaint, concerning which no evidence of inaccuracy was presented. The total dollar amount of the tax allowance benefits received was said to be $2,056,458. McDonald's liability for the 1996 tax year appears to be but $7,173.00, as contrasted with his potential liability of $86,820 for tax year 1997. We will leave to the Debtor the calculation of each partner's liability in light of our decision, which appears to range from slightly less than $20,000 to over $100,000 per partner.

### D. CONCLUSION

An order which is consistent with the legal conclusions which we have reached in this Opinion follows.

*ORDER*

AND NOW, this 30th day of July, 1998, after a trial of this proceeding on June 3, 1998, and June 4, 1998, and upon consideration of the parties' various post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in substantial part in favor of the Plaintiff–Debtor, LaBRUM & DOAK, LLP ("the Debtor").

2. It is DECLARED that, except as to Defendant KEAN K. McDONALD ("McDonald"), who we find entered into a valid settlement agreement with the Debtor limiting his liability to that for tax year 1996, the Debtor's allocation of its 1996 and 1997 federal income tax liability pursuant to Section 467 of the Internal Revenue Code, 26 U.S.C. § 467, to all former partners of the Debtor who had received tax benefits in the past, as well as to partners who remained at the Debtor's dissolution, is in conformity with applicable law.